661 P.2d 335

**Robert BURNHAM and Elaine Burnham, husband and wife, Plaintiffs-Appellants-Cross-Respondents,**

v.

**Robert BRAY and Mini-Cassia Equipment Co., Inc., a corporation; Robert Bray, Steven Bray and Cecil Shaw, as trustees of Mini-Cassia Equipment Co., Inc., Profit Sharing Plan and Trust, and Mini-Cassia Equipment Co., Inc., Profit Sharing Plan and Trust, a profit sharing plan, Defendants-Respondents-Cross-Appellants.**

No. 13507.

Court of Appeals of Idaho.

March 22, 1983.

Lloyd J. Webb of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, for plaintiffs-appellants-cross-respondents.

Larry R. Duff of Goodman, Duff & Chisholm, Rupert, for defendants-respondents-cross-appellants.

SWANSTROM, Judge.

When two business partners elect to dissolve their longstanding association the process may resemble a bitterly contested divorce. Neither party ends up liking the result.

This appeal arises from a trial judge's attempt to end the controversy generated in a sale by Robert and Elaine Burnham of their interest in Mini-Cassia Equipment Company to Robert Bray, a co-owner of the business. The trial judge had to construe certain disputed provisions of the buy-sell agreement between the parties. He also had to adjudicate rights and liabilities of partners in the dissolution of a separate partnership between Robert Burnham and Robert Bray. The judgment entered by the trial court awarded the Burnhams their interests in a profit sharing plan set up by Mini-Cassia. The Burnhams accepted payment of these funds, but later appealed from other parts of the judgment favorable to Bray. The judge declined to award attorney fees to either side. Each party has appealed from the order denying an award of fees to that party.

We are faced with the following issues in this appeal. (1) Does a party who accepts payment of certain sums awarded to him in a judgment, have standing to appeal from other aspects of the judgment? (2) Should the trial court have awarded attorney fees to any party in this case? (3) Did the trial judge err in interpreting provisions of the buy-sell contract relating to the dissolution of a partnership? (4) Did the court correctly distribute the partnership assets?

For several years prior to this suit, Robert Burnham and Robert Bray together operated a farm equipment business in Heyburn, Idaho. This business, Mini-Cassia Equipment Co., was operated in a corporate

form. The Burnhams owned 70% of the stock and Bray owned the remaining 30%. Burnham and Bray also had equal interests in a separate partnership called Burnham and Bray Rental Account. This partnership owned several assets including land and a building leased by Mini-Cassia for the site of its business.

On April 26, 1976, Robert and Elaine Burnham entered into a "Contract for Purchase" with Robert Bray, providing for the sale of the Burnhams' shares of stock of Mini-Cassia to Bray, the company's only other stockholder. The contract also provided for the dissolution of the partnership and for distribution of its assets. In addition, it specified how the Burnhams were to be paid for their interests in a profit sharing plan that had been created for Mini-Cassia employees in 1974.

The plan provided for a three-member committee to manage the day-to-day affairs of the plan. The committee was given power to determine eligibility questions and to disburse trust funds. The plan authorized the committee to act by majority vote. Its first three members were Robert Burnham, Robert Bray, and an accountant. The same persons also served as trustees of the plan, until the Burnhams sold their interest in Mini-Cassia to Bray in 1976.

The profit sharing plan contained a term providing that if more than 50% of the company's stock changed hands, all employees' interests in the profit sharing fund would automatically vest. In recognition of this term in the plan, the parties included the following provision in their buy-sell agreement.

*Profit-Sharing Plan:* The parties hereto do recognize that under the provisions of the Profit-Sharing Plan [sic] that all of the rights of Robert Burnham and Elaine Burnham shall become 100% vested and the Purchaser [Bray] and the Corporation do hereby agree that upon the request of the Seller [the Burnhams] the Purchaser and Mini-Cassia Equipment Company will take such steps as may be necessary to pay to the Seller their respective share of the Profit-Sharing Plan within sixty (60) days after the date of this agreement. PROVIDED, HOWEVER, the Seller does expressly acknowledge that in the event there is not sufficient cash to pay the same that they will accept note or lease agreements held by said Profit-Sharing Plan in lieu of cash.

In the late summer of 1976 the Burnhams first requested Bray to pay their share of the profit sharing funds. At that time, according to the testimony of the accountant, there was some $43,500 in the plan's trust account—more than enough to cover the Burnhams' interests. The Burnhams made a formal demand for payment in October, 1976. Bray refused to honor this request, contending that Robert Burnham, while he was still a trustee of the fund in late 1975 and early 1976, had made unauthorized and improper investments which jeopardized the solvency of the fund.

Specifically, Bray claimed that Burnham—without consulting the other trustees of the fund—invested nearly all of the liquid assets of the fund by purchasing certain equipment leasing contracts from Deseret Thrift Corporation at a discount. At that time Burnham was not only a stockholder in Deseret, but was also its president. By August of 1976, cash had begun to flow back into the trust account from the Deseret investments. Nonetheless, by November of 1976 all but one of the Deseret leases were delinquent. Thus, in response to the Burnhams' demand for cash, Bray offered that the Burnhams take Deseret leases in payment.

The Burnhams commenced this suit in 1977, claiming that Bray had breached the contract by failing to pay them the funds due under the profit sharing plan. The complaint demanded payment of the funds, damages, and attorney fees. Bray answered the complaint and counterclaimed, seeking dissolution of the partnership in accordance with the contract's provisions. The profit sharing trust and its trustees were brought in as additional parties to the suit.

When the case came to trial, Bray tendered payment of the Burnhams' share of the profit sharing funds to the court, which

awarded the Burnhams these funds in its judgment. However the court refused to award damages or attorney fees to the Burnhams. The court held that Bray and the other trustees had acted reasonably in withholding payment. Moreover, the court generally resolved the issues pertaining to the termination of the partnership favorably to Bray. After trial, the Burnhams requested the court to deliver the funds tendered by Bray, and the money was paid. The Burnhams then appealed from the judgment and from the court's order denying their various post-trial motions. Bray cross-appealed, claiming that the trial court erred in failing to award attorney fees to him. Bray later moved to dismiss the Burnhams' appeal on the theory that the Burnhams, having availed themselves of a portion of the judgment, forfeited their right to appeal it.

## I

The first issue we examine is whether to dismiss the Burnhams' appeal on the theory that they waived their right to appeal by accepting the benefits of part of the judgment and then appealing the remainder. The general rule is that a party cannot accept the benefits of a judgment and yet seek reversal of it on appeal. *Arizona Downs v. Superior Court,* 128 Ariz. 73, 623 P.2d 1229 (Ariz.1981); *In re Marriage of Jones,* 627 P.2d 248 (Colo.1981); *Brown v. Combined Insurance Co. of America,* 226 Kan. 223, 597 P.2d 1080 (Kan.1979); *Tara Oil Co. v. Kennedy & Mitchell, Inc.,* 622 P.2d 1076 (Okl.1981); *Graf v. Don Rasmussen Co.,* 39 Or.App. 311, 592 P.2d 250 (Or. App.1979). This rule, however, is riddled with exceptions. One of these is that acceptance of benefits of a part of a judgment does not bar relief—by way of appeal—from another disconnected portion. *See Henderson v. Nixon,* 66 Idaho 780, 786, 168 P.2d 594, 596 (1946). *See also Farmers Elevator Co. v. First National Bank,* 181 Colo. 231, 508 P.2d 1261, 1263 (Colo.1973). *Compare Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 606 P.2d 944 (1980) (judgment debtor *paid* part of judgment and appealed from other parts.) We believe that this exception governs here.

Neither Bray nor the other respondents ever disputed that Elaine and Robert Burnham each had a vested interest in the profit sharing fund. The amounts of the Burnhams' interests were not disputed, only the manner of payment. Bray resisted the Burnhams' request for payment in cash while several leases were delinquent. He believed that a full cash payment at that time might deplete the trust fund, threatening the interests of the other beneficiaries. At trial Bray tendered two checks to the court, one for $38,925.84, representing Robert Burnham's interest, and another for $2,872.97, representing Elaine's interest. All the parties agreed that these were the proper amounts, and these were the amounts entered in the judgment and paid to the Burnhams.

The Burnhams' right to collect their interests in the profit sharing funds is not in dispute on appeal. The issues in dispute are the Burnhams' claim to attorney fees and various questions pertaining to the dissolution of the partnership. Whatever outcome the court reaches on these issues will not affect the Burnhams' right to retain the sums they have already received. Accordingly, we hold that by accepting the sums awarded as their interests in the profit sharing fund, the Burnhams did not waive their right to appeal from the remainder of the judgment. *Henderson v. Nixon, supra.*

## II

The next issue is whether the trial court erred in denying the claims of both parties for attorney fees. Both the Burnhams and Bray base their claims for fees upon the following provision in the buy-sell agreement:

> ATTORNEY FEES: The parties hereto expressly agree that in the event suit is brought under this contract, the successful party shall be entitled to recover as cost of said suit a reasonable attorney fee....

The Burnhams contend they were the "successful party" because this lawsuit com-

pelled Bray to pay them their share of the trust fund. The facts found by the trial court are as follows: While Robert Burnham was a trustee of the plan between December 4, 1975, and April 6, 1977, he invested nearly $100,000 of the trust funds through Deseret Thrift Corporation, either in the form of direct loans or by purchasing discounted leases. These investments had not been authorized by the other trustees and were in violation of the profit sharing plan. During this period Burnham was a stockholder and officer of Deseret. Although, by the time of trial, all but one of the leases had been paid off, payment on the leases had been continually in arrears. These facts led the court to conclude that Bray and the other trustees of the plan offered the Burnhams cash payment as soon as they reasonably could. The court also concluded that the trustees acted reasonably to protect the interests of the beneficiaries and to preserve the assets of the trust.

The Burnhams argue that Bray's refusal to pay them in cash was wrongful because their contract was with Bray alone, not with the trustees of the plan. They assert that there was no condition precedent to *Bray's* contractual duty to pay, other than the presence of enough money in the account. The Burnhams assert that neither the long-term solvency of the fund nor allegations concerning Robert Burnham's breach of trust were relevant.

The language of the contract itself, however, leads us to reject the Burnhams' interpretation. It should be noted that the contract does not state that Bray shall pay upon demand. It merely states that Bray and the corporation "will take such steps as may be necessary to pay to the [Burnhams] their respective share of the Profit-Sharing Plan...." Moreover, by providing that the source of payment would be trust funds, the contract necessarily was subject to restrictions governing disbursement of such funds.

By the terms of the plan, Bray, as an individual trustee, had no power to make disbursements from the fund. Under the plan only a majority of the trustees or committee members could authorize disbursements. The trial court correctly held that the three trustees had a duty to scrutinize any requested disbursement to ensure that it would not threaten the solvency of the fund.

The court found that the trustees were unable, for a period of six months, to obtain information from Deseret as to the status of the leases in which the Burnhams had invested the plan's funds. Only when the Burnhams themselves authorized Deseret to provide such information was it available to the trustees. That information then showed all of the leases to be delinquent. This situation led the trustees to offer the Burnhams payment for their interest in the profit sharing plan, if the Burnhams would accept some of the leases in lieu of immediate cash payments. This offer was refused. Later, when the trustees had secured payment of all but one of the delinquent leases, they tendered cash payment in full to the court for the Burnhams' interests in the fund.

The findings of the trial court on this issue are supported by substantial, competent—although somewhat conflicting—evidence. Those findings will not be disturbed on appeal. *Cougar Bay Co., Inc. v. Bristol,* 100 Idaho 380, 597 P.2d 1070 (1979). The findings support the trial judge's conclusion that the trustees "offered payment in cash as soon as they reasonably could."

The Burnhams arguably were the "successful party" in this litigation, so far as payment of the profit sharing funds was concerned. However, the trial court found that the Brays and the other respondents prevailed on other claims arising out of the buy-sell contract. Although the judge acknowledged respondents "technically won the lawsuit," his decision—when read in its entirety—indicated that both the plaintiffs and the defendants had been partially "successful." The court considered the nature of the case, and characterized it as a "good faith contest." It is apparent he considered the result obtained in relation to the relief sought by the respective parties on the multiple claims. He determined the extent to

which each of the parties prevailed and he declined to award attorney fees to either side.

In *Chadderdon v. King,* 104 Idaho 406, 411, 659 P.2d 160, 165 (Ct.App.1983), we affirmed a district court decision denying attorney fees in a case where a contract provided for award of fees to the "prevailing" party but both parties prevailed in part. We held that I.R.C.P. 54(d)(1)(B), relating to partially prevailing parties, was applicable in such situations. We further said:

> Under Rule 54(d)(1)(B), a trial court, in the exercise of its discretion, may consider both the presence and absence of awards of affirmative relief, in determining which party prevailed either in whole or in part. We decline to interfere with this determination by limiting the scope of the inquiry available to trial courts in fulfilling their discretionary functions under the rule, except by the established test of whether an abuse of discretion has occurred. In *Hutchinson v. Kelton,* 99 Idaho 866, 590 P.2d 1012 (1979), our Supreme Court reviewed a discretionary determination under I.R.C.P. 54(d)(1)(B), and applied the test announced in *Lisher v. Krasselt,* 96 Idaho 854, 538 P.2d 783 (1975). We deem that test applicable here. In *Lisher* the court said:

> > [W]here the trial court has exercised such discretion after a careful consideration of the relevant factual circumstances and principles of law, and without arbitrary disregard for those facts and principles of justice, we will not disturb that action.

In the present case, we believe that the trial judge's decision not to award attorney fees to either side was the result of a proper exercise of his discretion. We affirm the order regarding costs and attorney fees.

### III

Next we address the issues relating to the dissolution of the Burnham and Bray partnership. Much of the trial focused upon division of the partnership assets. The principal assets were land and a building which served as the headquarters for Mini-Cassia Corporation.

### A

█ The "Contract for Purchase" entered into on April 26, 1976, contained provisions for dissolving the partnership and for selling its assets. Bray was to purchase the Burnhams' interest in the real estate. The selling price was to be one-half the "present market value," as determined by three appraisers. Unfortunately, the appraisal did not occur until October of 1978. The appraised value at that time was $170,-000. The value as of April 26, 1976, was determined to be $127,500.

The appraisal proved to be a bone of contention. Bray argued at trial and on appeal that "present market value" meant value as of the date of the agreement. The Burnhams asserted that the term referred the value on the date the appraisal actually occurred.

The resolution of this issue depends upon the interpretation of the following contract provisions:

DISSOLUTIONMENT OF BRAY-BURNHAM RENTAL ACCOUNT:

Purchaser and Seller in addition to being the joint owners of the stock of Mini-Cassia Equipment Company have operated a partnership known as "Bray & Burnham Rental" which owns the real property upon which Mini-Cassia Equipment Company is located together with various items and pieces of farm equipment, leases, and other investment. The parties hereto do expressly agree that said partnership shall be terminated as follows:

That the real property shall be appraised by three (3) appraisers, one to be appointed by Robert Bray, one to be appointed by Robert Burnham, and the said two appraisers shall appoint a third appraiser who shall appraise the real property owned by the partnership and determine its *present market value.* That the figure derived by said appraisers shall be binding upon the parties hereto and the Purchaser under this agreement shall

purchase the Seller's one-half interest in said real property ... *for a sum equal to 50% of the appraised price*, less indebtedness of the partnership. [Emphasis added.]

The trial judge determined that the term "present market value" referred to the value as of April 26, 1976, the date of the parties' agreement. The Burnhams contend that the phrase is ambiguous. They contend that the judge erroneously interpreted the phrase, awarding the benefits of the appreciation in value unfairly to Bray alone.

While we sympathize with the Burnhams' plight, we cannot agree with their contention. First, it is a general rule that when a partnership dissolves, its assets are to be valued as of the time of dissolution. *Wahlen v. Siaperas,* 93 Idaho 265, 460 P.2d 400 (1969). It is clear from the express terms of the contract that—as of its date—the parties were changing their former business relationship. Under Idaho law dissolution then occurred. *See* I.C. §§ 53–329, 330.

Second, we do not believe that the words "present market value," taken in the context of the parties' whole agreement, are ambiguous. To ascertain the intention of the parties, a court must view a contract as a whole and consider it in its entirety. *Canyon View Irrigation Co. v. Twin Falls Canal Co.,* 101 Idaho 604, 619 P.2d 122 (1980). In this case the parties' agreement to dissolve their partnership was made within the framework of a broader agreement to sever their ties completely. It is apparent from viewing the contract as a whole that the parties intended to achieve their separation without delay. All of the Burnhams' existing accounts owed to Mini-Cassia were to be adjusted as of the date of the contract and their "present" balance was to be paid by the Burnhams out of the down payment made by Bray. In this light, the natural meaning of the words "present market value" is the value at the time the contract was entered into, not at some indefinite time in the future. We hold that the trial judge correctly construed "present market value" to be the value as of April 26, 1976.

## B

After signing the agreement on April 26, 1976, the Burnhams moved to Nevada. Bray became the sole owner and the manager of Mini-Cassia Corporation. He also assumed responsibility for dissolving the partnership and for winding up its affairs. Previously Bray and Burnham together had fixed the amount of the rent Mini-Cassia had paid for its business premises to the partnership. In the fall of 1976, however, Bray unilaterally reduced the rent by half. This led Burnham to claim at trial that Bray had breached his fiduciary duty to his partner. Burnham also contended that Bray had breached the same duty by charging numerous building repairs to the partnership.

The trial judge found it unnecessary to address the question of Bray's breach of fiduciary duty, because the judge determined that the effective date of sale of the partnership real property to Bray was October 26, 1976. In so interpreting the contract, the judge concluded that, after October 26, 1976, Robert Bray individually was entitled to receive all rent paid by the corporation and also was solely responsible for all expenses incurred in connection with the building. Because Bray then became the sole owner of the real estate, he could not be guilty of self-dealing in regard to any transaction after that date.

Looking at the contract as a whole, we believe the court's interpretation was correct. The contract did not specify a date by which sale of the realty was to be complete. However, the court properly could infer that the parties intended to consummate the transaction within six months, because the contract expressly set a six-month deadline for disposal of all other assets of the partnership. We cannot say that it was error for the court to treat Robert Bray as the sole owner of the real estate after October 26, 1976. Therefore, after that date, none of Bray's decisions concerning rental payments and building repairs affected the Burnhams' interest in partnership assets.

It follows that the issue of alleged breach of fiduciary duty by one partner to the other need not be addressed on appeal.

## IV

The Burnhams also challenge the trial judge's determinations concerning personal property of the partnership, including two used combines—a Ford 640 and a Ford 630. Bray undertook to dispose of these combines for the partnership through the Mini-Cassia equipment business. The 640 combine was first sold for $15,000, the corporation taking a 10% commission on the sale. Unfortunately, the combine fell victim to frequent breakdowns. Repairs charged at several thousand dollars were performed by Mini-Cassia and assessed to the partnership. When the repairs proved fruitless, the buyer demanded recission of the contract. Mini-Cassia accepted return of the combine, crediting it back to the partnership, but charging all repairs and the 10% sale commission to the partnership. The combine was resold to another purchaser who experienced similar difficulties with it. The corporation again took a 10% commission for the sale, and again thousands of dollars of repairs were charged to the partnership. The second sale also was rescinded when the purchaser threatened legal action for breach of alleged warranties. At the time of trial, the combine remained in the partnership inventory.

Mini-Cassia also sold the 630 combine for the benefit of the partnership. As in the case of the 640, several thousand dollars of repairs were charged to the partnership. The corporation took a 10% commission for the sale. It also paid—and charged to the partnership—a $500 finder's fee to a customer who had located a buyer for the machine. At trial Burnham contended that Bray's handling of the sale of both combines involved a breach of his fiduciary duties to the partnership. He argued that the repair charges were unjustified and excessive. He further asserted that the payment of commissions and a finder's fee was unwarranted. However, the trial court determined that Bray's actions in regard to

the combines were reasonable and that the repair expenses, commissions and finder's fee were properly charged to the partnership. Our review of the record leaves us generally in agreement.

Because the partners mutually agreed that the partnership was to be dissolved, either partner had the right to wind up the partnership affairs in accordance with the agreement. Idaho Code §§ 53–318(5), 53–333 and 53–337. Disposition of the partnership's personal property was essentially left to Robert Bray when the Burnhams moved from the state. In respect to the partnership he was liquidating, Bray occupied a fiduciary position, and he was required by law to "account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the . . . liquidation of the partnership. . . ." I.C. § 53–321. Where, as here, claims of the dominant or managing partner against the partnership are questioned, the managing partner has the burden of proving the claimed expenses, incurred during dissolution, are reasonable and necessary. See Dunn v. Baugh, 95 Idaho 236, 238, 506 P.2d 463, 465 (1973); Brown v. Brown, 15 Ariz.App. 333, 488 P.2d 689 (Ariz.App.1971); and Pantages v. Arge, 1 Utah 2d 105, 262 P.2d 745 (Utah 1953).

We now examine Bray's proof concerning the sales of the combines. Both farmers who had purchased the 640 combine testified that the machine broke down constantly and would not run without interruption for more than a few hours at a time. This required frequent field trips by Mini-Cassia mechanics to repair the machine, and Mini-Cassia in turn charged the repairs to the partnership account as a cost of the sale. In determining what repairs to make following a sale, Mini-Cassia relied upon complaints made by the purchasers and upon decisions of its own mechanics as to what was necessary to make the machines operate satisfactorily. Before the sale the head mechanic for Mini-Cassia determined what repairs were necessary to make the machine marketable. This was the sole evidence

produced by Bray to show the necessity of particular repairs. However, the Burnhams did not refute this showing. We believe there was sufficient competent evidence to support the court's finding that Bray had acted reasonably in dealing with this combine for the partnership.

Concerning the amounts charged to the partnership, it appears that most of the repairs performed by Mini-Cassia—those made before the sales and billed directly to the partnership—were assessed at "cost." Some of the repairs—those made for the purchaser before a recission occurred—may have contained some profit factor, according to the testimony of Steven Bray, the son of Robert Bray. However, as to those repairs the evidence indicated only the usual and customary charges were made by Mini-Cassia for labor and parts. The Brays accounted fully for all charges made to the partnership. Robert Burnham had both the experience and knowledge necessary to rebut the inference of reasonableness raised by the evidence which Bray had presented. The Burnhams did not present any contrary evidence, although they had the opportunity to do so. Because the court's finding with regard to the repairs made to the 640 combine is supported by substantial, competent evidence, we will not disturb it on appeal. The circumstances are similar with respect to charges made for repairs to the 630 combine. We have reviewed the evidence and conclude that it supports the court's finding that the repair charges for the 630 combine were reasonable. Therefore this finding also will be sustained.

Next we consider the sales commissions and finder's fee. The evidence at trial showed that it was customary for Mini-Cassia to charge a 10% sales commission when it sold equipment belonging to the partnership. Moreover, a liquidating partner is entitled to reasonable compensation for his services in winding up the partnership affairs. I.C. § 53–318(6). Thus we believe that the sales commissions paid to Mini-Cassia in connection with the sales of the combines were proper. However, we do not have the same view of the $500 "finder's fee" paid to a person who brought in a buyer for the 630 combine. Defendants failed to prove there was any custom or necessity to charge such an additional fee against the partnership. On cross-examination Steven Bray testified that the customary Mini-Cassia commission was 10%. On remand we direct the district court to deduct the $500 finder's fee from the charges made by Mini-Cassia and to adjust the parties' accounts accordingly.

The Burnhams also challenge the value placed by the trial judge upon a truck which Robert Burnham had acquired from Mini-Cassia at the time of the buy-sell agreement. There was testimony—albeit disputed—that the company paid $800 for the truck at an auction and that some $450 in major repairs were performed on the vehicle. Bray thus contended that the vehicle was worth $1,250. Burnham on the other hand testified that the vehicle was one which had been valued by the company at $500 and was worth no more than that. The court found that the truck was worth $1,250 and found that Burnham owed Mini-Cassia that amount. Because we conclude that the judge's finding is supported by substantial, competent, although conflicting evidence, we affirm it on appeal.

Finally, in reviewing the partnership accounts, it appears that the trial court made a minor error in computing the liabilities of the partnership. In calculating the Robert Bray account, the court neglected to pro-rate the 1976 insurance premium on the partnership's building. Instead, the entire premium for 1976 was charged to the partnership. On remand the court should make a finding on this item and, if appropriate, should credit the partnership accordingly. After exhaustively reviewing the record, we have found no other errors in the court's accounting.

The judgment is affirmed except for the two modifications we have noted. No costs and attorney fees on appeal.

WALTERS, C.J., and BURNETT, J., concur.