796 P.2d 1026

James THOMAS and Joan Thomas, husband and wife, Plaintiffs–Respondents–Cross Appellants,

v.

Paul SCHMELZER and Ilene Schmelzer, husband and wife, Defendants–Appellants–Cross Respondents.

No. 16802.

Court of Appeals of Idaho.

July 26, 1990.

Alexanderson, Davis, Rainey, Whitney & Kerrick, Caldwell, for defendants-appellants-cross respondents. Ronald P. Rainey argued, Caldwell.

Gigray, Miller & Downen, Caldwell, on rehearing for plaintiffs-respondents-cross appellants. Donald E. Downen argued, Caldwell.

## SUBSTITUTE OPINION

The Court's prior opinion, dated December 1, 1988, is hereby withdrawn.

SWANSTROM, Judge.

This case involves the accounting and winding up of a partnership. Paul and Ilene Schmelzer appeal from the district court's amended judgment requiring them to purchase the interest of James and Joan Thomas in a partnership and to compensate the Thomases for net excess contributions during the winding up period. The main issue is whether there was a meeting of the minds to form an agreement calling for the Schmelzers to purchase the Thomases' partnership interest. Because we find insufficient evidence of a meeting of the minds, we vacate the district court's judgment. We remand with directions for further proceedings.

Through oral agreement, the Thomases and the Schmelzers formed a partnership on September 30, 1982, known as T & S Properties, for the purpose of purchasing, managing and renting real property in Caldwell, Idaho. For simplicity we will refer to each couple as a partner. The partnership acquired three residential properties from people named Hurst. Three separate contracts, "the Hurst contracts," were employed in this transaction. The Hurst contracts required the partners to make payments on an earlier contract called the Landreth contract. The partnership rented two of the residences to tenants. The other residence was used as a shared office by Paul Schmelzer for his accounting business and by James Thomas for his insurance business. The partnership also purchased a telephone system for use in the office. The rents received by the partnership did not meet its liabilities. Consequently, each partner made regular capital contributions.

The partnership was dissolved by agreement and by conduct on June 5, 1985. At the time of the dissolution, the partners' capital accounts were about equal. Thomas remained in possession of the office and continued to run his insurance business from it. Thomas also used the partnership telephone system. Neither partner actively pursued a winding up until March 1986 when the Thomases filed a complaint seeking a formal accounting and winding up.

During the post-dissolution period, James Thomas received the rents and paid accruing partnership debts. Thomas charged miscellaneous expenses to the partnership for maintenance and repair of all the properties. Thomas contributed additional capital to fully satisfy the obligations, and also contributed labor and services in maintaining and managing the rentals. The Schmelzers did not participate in any management, but did contribute a sum toward payments on the real estate contracts.

The Thomases filed a motion to have the Schmelzers show cause why they should not help pay partnership debts accruing through the winding up period. A show cause hearing was held on June 4, 1986, but was continued to June 19. On June 6 the Thomases purchased the Hurst contracts, thereby assuming the position of a secured creditor. The purchase of this partnership obligation was not divulged to the Schmelzers until immediately before the trial of the action.

A hearing was conducted on June 19 to further consider the motion to show cause and to determine whether it was necessary for the court to appoint an appraiser and an accountant to assist in the winding up process. At the hearing the parties entered into some stipulations. Both parties stipulated that a court-appointed account-

ant and an appraiser would not be necessary. The parties then stipulated to a partial settlement agreement. That agreement called for the Schmelzers to purchase the Thomases' interest in the partnership for $25,000. The parties further agreed to submit to the court all other issues that they could not settle relating to the accounting from the date of dissolution to the trial date. The parties orally affirmed to the judge their acceptance of this settlement agreement. Although the judge directed the parties to reduce their agreement to writing, no writing was made. Trial was scheduled for August 14.

A few days prior to trial the Thomases sent notice of default on the Hurst contracts to the Schmelzers. From this notice the Schmelzers first learned that the Thomases had purchased the sellers' interest in the contracts. On the morning of the trial, the Schmelzers presented arguments for setting aside the settlement agreement. This was based on the revealed purchase by the Thomases of the Hurst contracts and on an alleged change in position by the Thomases concerning several expenses the Schmelzers thought were covered in the agreement. The change in position came to light four days before trial during the Thomases' depositions. The court decided to proceed with trial and to rule on the validity of the settlement agreement at the close of trial.

Following trial the district judge made extensive findings and conclusions, and entered judgment for the Thomases. The judgment incorporated the settlement agreement. The district judge upheld the agreement, finding it to be the result of fair and equal bargaining.

The court found that the Thomases had purchased the Hurst contracts without improper motives or intent. The court concluded that the purchase was not a breach of fiduciary duty. The court allowed compensation to the Thomases for their labor and services in maintaining the rentals, but not for their management services. The court found the expenditures incurred by the Thomases after dissolution were necessary and proper to preserve partnership

assets during winding up. The judgment and findings were amended to correct mathematical errors.

■ Findings of fact by a trial court will not be disturbed on appeal unless they are clearly erroneous. I.R.C.P. 52(a). Consequently, our standard for reviewing a trial court's findings and conclusions is to determine whether they are supported by substantial evidence and to determine whether the trial court properly applied the law to the facts as found. *See Rasmussen v. Martin*, 104 Idaho 401, 659 P.2d 155 (Ct. App.1983).

We first consider the validity of the settlement agreement. Relying upon *Hershey v. Simpson*, 111 Idaho 491, 725 P.2d 196 (Ct.App.1986), the district court upheld the agreement. However, we are not faced, as we were in *Hershey*, with issues of whether the terms of the agreement are unconscionable or whether the agreement was reached through unfair or unequal bargaining. Rather, the main issue in this case is whether there was a meeting of the minds to create an enforceable agreement.

■ Proof of a "meeting of the minds" requires evidence that the parties had a mutual understanding of the terms of their agreement and that they mutually assented to be bound by those terms. The determination of whether there was sufficient evidence to show a meeting of the minds to form an express agreement is a question of fact to be resolved by the trier of fact. *Glenn v. Gotzinger*, 106 Idaho 109, 675 P.2d 824 (1984); *Bischoff v. Quong-Watkins Properties*, 113 Idaho 826, 748 P.2d 410 (Ct.App.1987).

■ Here, the evidence of a meeting of the minds must be found in the transcript of the June 19, 1986, hearing where the settlement agreement was announced and acknowledged. As the hearing progressed it became obvious that the Schmelzers had complied with the show cause order and that a court-appointed accountant was no longer required. The discussion then turned to the need of an appraiser and the valuation of partnership assets. The Thomases' attorney commented:

With respect to the valuation of the assets, perhaps we still do need an appraiser. I don't want to disclose settlement discussions improperly, but I think I can say that the Schmelzers have offered to purchase the Thomas interest for a certain sum plus on top of which they're willing to pay an amount for what they acknowledge to be Mr. Thomas's excess contribution. They say the excess contribution is in the neighborhood of $172. Our proof will be substantially different making it in the neighborhood of seven to eight thousand dollars.

I don't know if the parties would be ... or if the Schmelzers would be interested in agreeing to purchase the Thomas interest for the $25,000 plus whatever the Court determined the excess contribution to be. I think that if there was an interest in that, then there may not be a need for an appraiser, but that's where we stand at this point, to my knowledge....

The Schmelzers' attorney responded:

With regard to an appraisal, Your Honor, the Schmelzers have put a price on the property and have made a buy-sell offer acknowledging—I think the figures probably correct, approximately $172, somewhere in that area, that they would acknowledge. And if they [the Thomases] are still at 7,000, 8,000, there is quite a bit of difference.

But I guess our point is, Your Honor, that if we have a court-appointed appraisal, we want it to be binding.

First of all, we don't really want to spend the money. It would probably cost another $500 to get a certified appraisal. And if I hear Mr. Thomas saying he's willing to sell at that price and leave it to the Judge as to what's in and what's out, is that what we're talking about?

MR. THOMAS: You bet.

[SCHMELZERS' COUNSEL]: We haven't discussed that angle, but that would certainly settle it if we can—

Obviously, the above colloquy reveals no meeting of the minds between the parties. The discussion apparently settled some valuation concerns dispensing with the need for an appraiser. Based upon the above comments, the district judge called a recess and asked the parties to see if they could come to an agreement. An agreement purportedly was reached during the recess. When the parties returned into court, the Thomases' attorney explained his understanding of the agreement.

If it please the Court and Counsel, I'll attempt to state what I understand to be the status at this point. The parties have agreed that Mr. and Mrs. Schmelzer will purchase the Thomas interest in the partnership for the sum of $25,000. The parties have further agreed that they will submit to the Court for decision the issues relating to the accounting from the date of the dissolution of the partnership to the date of trial.

Then followed a discussion about the disposition of the partnership assets. Questions about when the Thomases would have to relinquish possession to the Schmelzers were left for the court to decide, along with the amount of rent the Thomases would have to pay for using partnership property. As the parties' discussion of the purported settlement agreement developed, several questions arose with respect to the accounting. The transcript continues with the following exchanges, starting with the Schmelzers' attorney:

Your Honor, if I understand, then, nothing—there has been no binding sale at this time. It's still partnership property. We have an offer basically. The Court's going to give us the date of the closing and such.

COURT: Well, what I'm going to do at this particular time is I'm going to— based upon the stipulations, and I'll ask both parties, the stipulations as I understand it is that in order to avoid the issues with regard to valuation and to having an appraiser or an accountant, that the parties have agreed that the Schmelzers will purchase the Thomases' interest for the sum of $25,000. Then the Court will determine as part of those issues the fair rental value of the office building. The parties have agreed that

the $435 item prior to June 5th, 1985, that there will be a charge of $220 against the Thomases on that matter.

And then as to all other remaining issues that the parties can't agree on between now and then, the Court will determine them. If you can agree on those issues, fine, but I'll take into consideration what the accounting shows in trying to then make a determination based upon that accounting as to all remaining unresolved issues.

. . . . .

But in any event, at this point, I would suggest the parties on anything that they agree to, reduce it to writing and have it signed by all the parties.

Now I'm going to ask Mr. Thomas, those things that the Court has recited, are those stipulations that you and your wife are agreeable to?

MR. THOMAS: I think so, Your Honor. I think the Court needs to understand that I run an office in that office building and that I can't just pick up and move with a week's notice, so I will need a reasonable length of time in order to—

COURT: Well, those will be part of the proofs, either that, or there'll have to be an agreement one way or the other to work that out.

And then are those stipulations that the Court has indicated that the parties have made, are those stipulations that the Schmelzers have agreed to? Mr. and Mrs. Schmelzer, is that correct?

MRS. SCHMELZER: Yes.

MR. SCHMELZER: Yes.

COURT: Okay, Mr. Thomas, do you again speak for your wife at this hearing so that this stipulation is binding not only on you, but on her?

MR. THOMAS: Yes, Your Honor.

COURT: Okay, fine. If there's nothing further, then, I assume the status of the order to show cause has been resolved, and what I will do at this point is enter an order saying that the parties have agreed that no further action need to be taken on the order to show cause and/or on the request for appointment of an appraiser or an accountant.

Noticeably absent in the comments above is any clarification as to the effect of the settlement agreement and as to the scope of the accounting. As noted, at the time of dissolution the respective capital accounts were about equal; the Schmelzers' account was at $22,412, and the Thomases' account stood at $22,513. On the morning of the trial, the Schmelzers' attorney pointed out the Thomases "were no longer agreeing that certain expenses that we had counted on in making the $25,000 as personal expenses, they are now considering as partnership expenses...." this purported change of position is a further indication there was no clear meeting of the minds.

At trial, the Schmelzers testified concerning their understanding of the agreement. They thought the $25,000 would settle all claims by the Thomases for excess contributions. In the Schmelzers' minds the accounting would focus on the amount the Thomases owed for rent of the office after dissolution, a proration of taxes and insurance, and the closing costs involved in the sale or transfer or partnership assets. As it turned out the accounting considered *all* post-dissolution issues related to the contributions and expenditures of the Thomases and the Schmelzers. If the settlement agreement was an attempt to resolve disputed issues, we fail to discern from the record what issues it settled.

Moreover, the Thomases' undisclosed purchase of the Hurt contracts affected the validity of the settlement agreement. Given the acrimonious feelings existing between the parties, a creditor/debtor relationship would likely be unacceptable. The Schmelzers testified that had they known of this fact at the June 19 hearing they would not have entered into the settlement agreement.

■ Furthermore, the Schmelzers' purchase of the Thomases' interest appears to have had no effect on the parties' competing claims. A partner's interest in the partnership is his share of the profits and surplus, constituting an undivided part ownership in the business as a whole, and the same is personal property. I.C.

§ 53–326. This interest is intangible and exists only in connection with the assets or value of the partnership. 59A AM.JUR.2D *Partnership* § 387 (1987). When one partner purchases the interest of the other, the transaction presumptively includes a final settlement of all partnership indebtedness existing between the partners. *See, e.g., Ramseyer v. Ramseyer,* 98 Idaho 47, 558 P.2d 76 (1976); *Bussell v. Barry,* 61 Idaho 350, 102 P.2d 280 (1940). *See generally* 59A AM.JUR.2D *Partnership* § 391 (1987).

The evidence in the record does not disclose that the parties had a mutual understanding of the settlement agreement's effect and terms. In sum, the evidence does not support the district court's finding that the settlement agreement was valid. We hold that the agreement must be set aside due to insufficient evidence showing a meeting of the minds. Consequently, the judgment must be vacated. This case must be remanded for further proceedings to settle the account between the parties. We offer the following guidance on issues which will affect the accounting.

The Schmelzers contend the purchase of the Hurst contracts by the Thomases was a breach of fiduciary duty and extinguished the partnership's obligation. The district court disagreed and concluded there was no breach of duty. We determine the district court erred as a matter of law.

■ We begin by examining the duties of partners. Under I.C. § 53–321, every partner is a fiduciary and a trustee. He must account to the partnership for any benefit or profit derived by him through use of partnership assets, even during the winding up period. *Murgoitio v. Murgoitio,* 111 Idaho 573, 726 P.2d 685 (1986). The Supreme Court of Kentucky has described the nature of this relationship.

> The relationship of partners is a close one and imposes upon each the obligation of loyalty, integrity and the utmost good faith and fairness with respect to partnership affairs. This obligation begins with the preliminary negotiations and continues throughout the life of the relationship. [Citations omitted.] No undue advantage of one over another by misrepresentation or concealment will receive the approval of the law. A court of equity will always grant relief to the partner who has suffered from a breach of the obligation. One partner will not be permitted to obtain secretly any right that should belong to the partnership and put it to his own individual profit. Of such character is the securing of a contract. The criterion is not an actual evil motive, for the courts look to the result of any such action regardless of evil intent. If such action results in profit or advantage, the courts will require an accounting. [Citations omitted.]

*Stephens v. Stephens,* 298 Ky. 638, 183 S.W.2d 822, 824 (1944).

■ The Thomases retained their status as partners during the winding up period. *See* I.C. § 53–330. They purchased the Hurst contracts to avoid the consequences of default. Their goal may be acceptable, but the law refuses to recognize this basis as a justification for finding no breach of a fiduciary duty. *See, e.g., Ebest v. Bruce,* 734 S.W.2d 915 (Mo.App. 1987). Through their undisclosed act, the Thomases obtained an advantage over their partner by stepping into the shoes of a secured creditor. We reject the finding that this act did no economic harm to the partnership or to the Schmelzers. At least the Schmelzers suffered because they were being subject to demands for immediate payment of the contract indebtedness plus attorney fees as sought by the Thomases in the notice of default. We hold that the Thomases' purchase on June 6, and the concealment of it during the June 19 negotiations, was a breach of their fiduciary duties to account and to render full information. I.C. §§ 53–320, –321; *see also Ebest v. Bruce, supra.*

■ We now examine what effect the Thomases' purchase had on the partnership obligation. As discussed, partners hold as trustees the profits they may derive from partnership assets. By analogy, a partner who purchases a partnership obligation will be treated as holding it for the benefit of the partnership. *Ebest v. Bruce, supra; see also Deavenport v. Green Riv-*

*er Deposit Bank,* 138 Ky. 352, 128 S.W. 88 (1910); 59A AM.JUR.2D *Partnership* § 462 (1987). Such a purchase effectually extinguishes all of the partnership obligation; that obligation is replaced with a new and different one. The partner purchasing a partnership obligation has the right to have his capital account credited for the actual amount expended and may obtain contribution from the other partners in an accounting. *Ebest v. Bruce, supra; Deavenport v. Green River Deposit Bank, supra.* Here, on remand, the district court is to proceed with the accounting by applying the above principles to the contracts purchased by the Thomases.

Another issue raised by the Schmelzers which must be addressed is whether the district court properly applied the law of partnership in allowing compensation to the Thomases for labor and services. The Schmelzers point to I.C. § 53–318(6) which provides that no partner is entitled to remuneration for acting in partnership business, except for a surviving partner. Although we do not find the statute dispositive, we agree in principle with the Schmelzers' argument.

 The provision found in I.C. § 53–318(6) is declaratory of the common law, recognizing that in managing partnership affairs each partner is taking care of his interest and a partner is not entitled to compensation in the absence of an agreement to the contrary. *See generally* 59A AM.JUR.2D *Partnership* § 483 (1987). We find the following statements persuasive:

> With an agreement, a partner's services in carrying on the firm's business entitle him to no compensation other than his share of the profits. "The reason is that the partner is but attending to his own affairs."
>
> . . . .
>
> With monotonous regularity, partners in disputed dissolutions pad their demands with claims for compensation. While it is important that equity be done, the courts should insist on convincing evidence to overcome the noncompensation rule. Otherwise a basic principle is violated when a partner, by a dubious salary claim, is permitted double compensation (once in profits and once in salary) or insulation from loss (by offset of the salary claim). The frequency of this kind of litigation emphasizes the importance of explicit, written agreement on compensation.
>
> . . . .
>
> The U.P.A. [Uniform Partnership Act], in creating a presumption that a surviving partner is entitled to compensation for winding up partnership affairs, goes somewhat beyond the common law rule. [Footnotes omitted.]

J. CRANE & A. BROMBERG, LAW OF PARTNERSHIP § 65(e) at 375–79 (1968).

 The above authority, however, opines that there may be an exception to the general rule: "If a partner's services are the kind which would not normally be performed by a partner, it is reasonable to allow compensation on a quantum meruit theory." *Id.* at 378. There is authority that quasi-contract or quantum meruit are improper bases for an award of compensation where the partnership exists under an express agreement without provision for such compensation. *See generally* 59A AM.JUR.2D *Partnership* § 491 (1987). We do not find the authorities contradictory; compensation to a partner for services outside those contemplated by the partnership agreement, which benefit the partnership, may properly be awarded.

 This does little to assist the Thomases. There was no agreement providing for compensation for their services. Their services and labor were directed to managing and maintaining the rental properties. This type of performance is the kind reasonably expected of partners in the business of managing and renting residential properties. We conclude the district court erred as a matter of law in allowing the Thomases compensation for their labor and services. The district court on remand must adjust the accounting by not allowing this compensation.

The Schmelzers question whether the Thomases should be allowed expenses and

contributions for certain acts occurring after dissolution; particularly, the costs for repair of the rental properties. The point raised encompasses these issues: whether the Thomases had authority to act for the partnership and whether the Schmelzers' consent was necessary to incur the expenses for matters connected with partnership business.

 Under I.C. § 53–333, a partner's authority to act for the partnership after dissolution is limited to those acts necessary for winding up partnership affairs. If the acts are questioned, the partner incurring the expenses has the burden of proving the claimed expenses are reasonable and necessary. *Burnham v. Bray,* 104 Idaho 550, 661 P.2d 335 (Ct.App. 1983). This presents issues of fact. Our review of the record reveals the district court had substantial evidence to support its finding regarding the necessity and reasonableness of the expenses. Further, pursuant to I.C. § 53–318(2) the partnership must indemnify every partner for liabilities reasonably incurred by him in the ordinary and proper conduct of its business or for the preservation of its business or property. The expenses incurred by the Thomases were related to the repair and maintenance of the partnership property. The actions of the Thomases preserved the property and prevented a wasting of assets. The partnership must properly indemnify the Thomases for these expenses.

 The Schmelzers also contest the expenses because they did not consent to them. They point out that I.C. § 53–318 sub-part (5) mandates equal management rights, and sub-part (8) requires a majority decision for any differences arising as to ordinary matters connected with the partnership. *See Summers v. Dooley,* 94 Idaho 87, 481 P.2d 318 (1971). Of course, we acknowledge these statutory propositions. But, as the trial court implicitly found, the Schmelzers unreasonably withheld their consent because without the repairs made by the Thomases the premises were unrentable.

The remaining accounting issues concern individual expenses or contribution items. These items require the determination and finding of facts. We have not been presented with any evidence or argument which would cause us to set aside the district court's findings on those matters.

 The Schmelzers' final issue is whether they were wrongfully denied a jury trial. The right to a trial by jury is secured by article 1, § 7, and article 5, § 1 of the Idaho Constitution and by I.R.C.P. 38(a). However, these provisions simply preserve the right as it existed at common law. Consequently, they do not extend the right of trial by jury to actions solely involving equity issues such as the accounting and winding up of a partnership—a matter traditionally the province of the courts of equity. *See Craig v. Hamilton,* 213 Kan. 665, 518 P.2d 539 (1974), *appeal after remand* 221 Kan. 311, 559 P.2d 796 (1977). However, our Supreme Court recently held that, unless "imperative circumstances" are present, a defendant in an equity action cannot be denied his right to a jury trial on issues raised in his counterclaim seeking relief of a legal—rather than of an equitable—nature. *David Steed & Associates v. Young,* 115 Idaho 247, 766 P.2d 717 (1988). "The Seventh Amendment [jury] question depends on the nature of the issue to be tried rather than the character of the overall action." *Ross v. Bernhard,* 396 U.S. 531, 537–38, 90 S.Ct. 733, 737–38, 24 L.Ed.2d 729 (1970).

 The Schmelzers alleged four counterclaims against the Thomases: misappropriation of partnership assets and rents, breach of fiduciary duty, reasonable rental value of partnership property used during the winding up, and the inclusion of the Hurst contracts as assets of the partnership. The Schmelzers sought general and punitive damages. Absent the request for damages, these claims do not contain issues of a distinct legal nature. The issues are part of the equitable accounting sought in this action. Therefore, the Schmelzers were not entitled as a matter of right to a jury trial on their counterclaims.

In summary, the settlement agreement is set aside for lack of a meeting of the

minds. The Thomases' undisclosed purchase of the Hurst contracts is held to be a breach of fiduciary duty. Neither the payment nor the default and forfeiture provisions of these contracts can be enforced against the partnership because Thomas is deemed to have acquired the contracts for the benefit of the partnership. Nevertheless, the Thomases' capital account is to be credited for the actual cost of acquiring the contracts. The Thomases are not entitled to compensation for their general labor and management services. The Thomases are entitled to indemnification of their expenses for the repair and maintenance of partnership property. The other findings on general accounting issues are upheld as supported by substantial evidence.

The amended judgment is vacated. The case is remanded for a further accounting, consistent with the principles set out in this opinion. Because each side prevailed in part in this appeal, no costs or attorney fees will be awarded.

WALTERS, C.J., and BURNETT, J.,* concur.