[Nos. G015998, G020272. Fourth Dist., Div. Three. Dec. 5, 1997.]

AB GROUP et al., Plaintiffs, Cross-defendants and Respondents, v. JOHN E. WERTIN, Defendant, Cross-complainant and Appellant.

AB GROUP et al., Plaintiffs, Cross-defendants and Respondents, v. PACIFIC COMPANY, Defendant, Cross-complainant and Appellant.

## COUNSEL

Horvitz & Levy, Frederic D. Cohen, Gary Gleb, Makin & Pentis, Makin & Masoner and Cynthia Makin for Defendants, Cross-complainants and Appellants.

Pinto, Gromet, Dubia & Worcester and Christian F. Dubia, Jr., for Plaintiffs, Cross-defendants and Respondents.

## OPINION

**SILLS, P. J.**—A partnership opportunity can be many things. It can be the prospect of a lucrative contract with the federal government to build a regional tax processing center. (*Leff* v. *Gunter* (1983) 33 Cal.3d 508 [189 Cal.Rptr. 377, 658 P.2d 740].) Or it can be the prospect of large contingency legal fees earned on a major antitrust suit. (*Rosenfeld, Meyer & Susman* v. *Cohen* (1983) 146 Cal.App.3d 200 [194 Cal.Rptr. 180].)[1] Or it can be the right to occupy the space on which the partnership is doing business. (*Ferry* v. *McNeil* (1963) 214 Cal.App.2d 411 [29 Cal.Rptr. 577].)

But a partnership opportunity is most assuredly *not* the possibility of extracting a discount on a partnership loan by refusing to pay an undisputed debt and putting the creditor to the expense and risk of a lawsuit to collect. If there were such a thing, partners could find themselves under a fiduciary duty to *refrain* from paying the lawful obligations of their partnership.

---

[1]*Rosenfeld* was overruled on another point in *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 521, footnote 10 [28 Cal.Rptr.2d 475, 869 P.2d 454].

Equity, however, does not impose, much less countenance a duty to "stiff" one's creditors. Accordingly, we reject the very premise on which appellant John E. Wertin bases this appeal from a judgment after a partnership dissolution and accounting—namely, that his former business partners should *not* have done the honorable thing and retired a partnership debt, but should have tried to leverage a discount from a bank by withholding loan payments.

FACTS

In September 1987, John Wertin, George Argyros and David Ball agreed to form a partnership—known as AW Associates No. 2 (or AW2 for short)—to develop certain real estate in Riverside County known as the Lake Hills Property. The partnership was structured so that it was made up of two companies: the Pacific Company, controlled by Wertin, and the AB Group, itself a partnership, controlled by Argyros and Ball. The AW2 partnership agreement made Wertin, Argyros and Ball "affiliates"; they each agreed to sign a contract guaranteeing the performance of the particular AW2 partner they controlled. Wertin signed a personal guarantee of the Pacific Company's obligations under the partnership agreement; Argyros and Ball executed similar guarantees for the AB Group.

AW2 obtained loans and a line of credit from Security Pacific National Bank. The bank required Wertin, Argyros and Ball to sign personal guarantees for portions of those loans. The guarantees were signed by all three men. The guarantee agreements specifically provided that each of the guarantors had the right "to purchase all but not less than all of the Loan from the Bank by payment to the Bank in cash of an amount equal to all sums then outstanding under the Note and the Other Loan Documents."

By September 1991, AW2 owed $15.3 million. Of this amount, $10.2 million had been guaranteed by Wertin, Argyros and Ball. The real estate market in Southern California had collapsed. AW2's assets were not worth what they used to be. AW2 had defaulted on its loan payments.

Wertin, Argyros and Ball fell into a major disagreement about what to do. Wertin, through the Pacific Company, advocated withholding payments on AW2's debt during negotiations. Argyros and Ball took a different tack, and starting in October made interest payments to the bank totaling about $740,000. (Under the partnership agreement, whenever one partner or its affiliate made a payment to the bank pursuant to a lender guarantee, the other partner was obligated to make an equal payment, and failure to do so was a default under the partnership agreement.) Wertin and the Pacific Company were notified of all these payments. For his part, Wertin did not make any payment.

In January 1992, AB Group, Argyros and Ball sued Wertin and the Pacific Company for, among other things, partnership dissolution and an accounting. Wertin and the Pacific Company filed a cross-complaint which alleged breach of fiduciary duty based on the payments made by the plaintiffs to the bank in March 1992.

On September 24, 1992, during the discovery phase of the litigation, each of the parties (the AW2 partnership, AB Group, the Pacific Company, Wertin, Argyros and Ball) entered into two "preworkout" agreements concerning AW2's debts with Security Pacific's successor, Bank of America. While the entirety of the contracts do not bear verbatim repetition, we recount the salient language. The agreements provided that each party had the right to "negotiate various courses of action with any other Party." The preworkout agreements also contemplated the possibility of bilateral or side agreements on "individual issues" between various of the parties. They also acknowledged the fact that each of the parties might have "other," independent loans with the bank, and specifically provided that each party would have the right to "negotiate" with the bank regarding those loans. Moreover, any evidence in connection with the workout discussions could not be used for *any purpose whatsoever* in *any* judicial proceeding.

In the summer of 1993 the parties discussed with the bank the purchase of the outstanding unsecured debt of the partnership; the end result was that Argyros purchased the debt on August 13 for its undiscounted face value of approximately $8.9 million. Wertin did not participate in the purchase though he made an attempt to do so.[2]

Trial on the accounting action had already begun by August 10, a few days before the purchase. The first item of litigation concerned a matter not otherwise relevant to this appeal,[3] and was concluded that day. Counsel for Wertin then requested that a referee hear the next aspect of the case, the accounting and dissolution phase. The court granted the request, and ordered the parties to discuss who the referee might be. On August 12 (the day before the purchase of the debt) retired Presiding Justice John K. Trotter was appointed.[4]

During the proceedings before the referee, Wertin and the Pacific Company sought to introduce evidence which, they contended, would have shown that Argyros and Ball obtained discounts on debts unrelated to the

---

[2]Wertin's attempt is the subject of a different action and appeal, *Wertin v. Bank of America* (Dec. 5, 1997) G016618, with which we deal in an unpublished opinion.

[3]The issue was whether a certain buy-out offer made by Argyros, Ball and AB conformed to the AW2 partnership agreement's "buy-sell" clause. The court ruled it did not.

[4]Justice Trotter served as Presiding Justice of this division from 1982 through 1987.

AW2 partnership as a result of the interest payments made on the AW2 debt. Moreover, Wertin and the Pacific Company also sought to reopen discovery to allow them to explore whether Argyros had been able to obtain discounts on his other loans with Bank of America by buying the AW2 debt at its face value.

Justice Trotter did not admit the proffered evidence or reopen discovery, remarking he could not "accept the argument that there is a breach of fiduciary duty for paying a legal debt." Accordingly, he found all payments made by the plaintiffs were proper. He credited the interest payments to Argyros and Ball's capital account, found that Wertin and the Pacific Company were fully liable to Argyros and Ball for one-half the unsecured debt owed by AW2, and declared that Wertin and the Pacific Company had breached the partnership agreement by failing to make required capital contributions. The result was a finding that Wertin and the Pacific Company owed the AB Group, Argyros and Ball $6.7 million plus interest.

The trial judge adopted Justice Trotter's findings. He remarked that Wertin could hardly complain that Argyros and Ball had committed the "outrageous and audacious act of paying off his debt." He also ruled that the accounting subsumed the causes of action in the cross-complaint, including breach of fiduciary duty. A judgment was entered ordering Wertin and the Pacific Company to pay the sums set forth in the accounting.

From that judgment both Wertin and the Pacific Company have appealed.[5] As we now explain, both the referee and the trial judge were correct.

## DISCUSSION

### *The Possibility of Obtaining a Discount on a Loan by Threatening Default Is Not a Legitimate Partnership Opportunity*

■ The centerpiece of Wertin's appeal is the idea that Argyros and Ball "advanced their own interests at the expense of the partnership" when they made interest payments on the loans to the partnership. If the idea is accepted, the referee and the trial court erred when they excluded evidence of that supposedly improper advancement.

[5]During the pendency of this appeal, the Pacific Company was in bankruptcy. Upon learning of the bankruptcy this court stayed the appeal as to the Pacific Company and created a separate appellate case number for the stayed appeal, allowing Wertin's appeal to go forward. Subsequently, this court was informed that the bankruptcy stay was lifted, so we in turn lifted the stay of the Pacific Company's appeal. Hence there are two appellate case numbers for what is, in essence, only one appeal.

Wertin's brief is studded with references alluding to the traditional rule against partners grabbing for themselves opportunities which properly belong to their partnership. Argyros and Ball are alleged to have taken for themselves "the opportunity to discount a partnership debt," and thereby usurped "the partnership's opportunities" for "enormous discounts."

At the core of Wertin's argument, however, is an idea that dare not speak itself plainly. What Wertin is really saying, unadorned, is this: By the simple act of not paying a lawful debt, a debtor can force a discount from a creditor because of the risks and collection expenses associated with litigation. That discount might vary, depending on the facts of each case, but it was there for the taking (i.e., constituted a partnership "opportunity"). Thus deconstructed, Wertin's argument plainly rests on the premise that in partnership matters it is ok—and sometimes even required—*not* to pay one's debts.

Wertin appears to have overlooked the elementary proposition that a borrower *is* legally obligated to repay his or her loans. (See *Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791, 802 [35 Cal.Rptr.2d 418, 883 P.2d 960], quoting 4 Miller & Starr, Cal. Real Estate Law (2d ed. 1989) § 10:3, p. 651 [" 'A loan transaction contemplates a debtor-creditor relationship with an obligation of the 'debtor' to repay the amount of the loan to the creditor . . . .' "].)

He also appears to have overlooked the rule that a proceeding for a partnership dissolution and accounting is an *equitable* matter and that his claim must be tested under equitable principles. (*Kaljian* v. *Menezes* (1995) 36 Cal.App.4th 573, 585 [42 Cal.Rptr.2d 510] [" 'Until the affairs of the partnership are wound up and settled the claims of the respective partners are, strictly speaking, equitable . . . .' "]; *Oliker* v. *Gershunoff* (1987) 195 Cal.App.3d 1288, 1306 [241 Cal.Rptr. 415] ["A judicial dissolution and supervised accounting of a partnership is an equitable action."].)

Equity can hardly tolerate—much less impose as a duty—the deliberate attempt to deprive a contracting party of the fruits of his or her bargain, even if the bargain is a loan transaction. As the California Supreme Court has said in the insurance context, "There is an implied covenant of good faith and fair dealing in every contract that neither party *will do anything which will injure the right of the other to receive the benefits of the agreement.*" (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883], italics added.) Indeed, if an insurance company were to do what Wertin wanted the AW2 partnership to do in this case—deliberately not pay on a contract in order to negotiate a discount from what it would otherwise lawfully owe—it would expose itself to well-deserved tort and

punitive damages for breach of the covenant of good faith and fair dealing. (E.g., *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 923 [148 Cal.Rptr. 389, 582 P.2d 980] [tactics to "force a settlement more favorable to the company than the facts would otherwise have warranted" justified punitive damages].)

Even though the AW2 partnership may not have risked tort or punitive damages by simply not paying on its loans, that would not make its action any more equitable.[6] Wertin's position, essentially, is one which would require a court of equity to stamp its imprimatur on unclean hands.[7]

We recognize, of course, that not all loan discounts are necessarily the result of the bad faith of the borrower, as *Ebest* v. *Bruce* (Mo.Ct.App. 1987) 734 S.W.2d 915, discussed below, illustrates. Sometimes lenders make bad deals and the interest rate, in time, becomes too low relative to the return on other investments. As the vicissitudes of the bond market demonstrate, the value of an obligation to repay will tend to decline in a period of rising interest rates.

But in the equitable matter of partnership fiduciary duties, there is a difference between simply buying up an obligation at its discounted present value and trying to *create* a discount by a bad faith refusal to pay a loan.[8] Most bonds are, after all, traded with the expectation that the borrower will pay them. Simply buying up an obligation at a discount may indeed represent a legitimate partnership opportunity—but even then the partner who

---

[6]At oral argument Wertin's counsel pointed to the doctrine of the rational breach to justify Wertin's position. The doctrine, however, does not help Wertin here: No one is seeking tort or punitive damages against him for breach of contract. There is a difference between a sensible limitation on contract damages (insurance contracts excepted), and the nonsensical idea that a partner's fiduciary duty to another *requires* a breach of a perfectly legal contract.

[7]Wertin argues that withholding loan payments is a practice Argyros and Ball have followed in other business transactions, so they can hardly say that making the loan payments was something "required" of them. The contention is a classic argument ad hominem. We are not concerned with the equities of Argyros's and Ball's other business transactions, and they are not asking us in this appeal to put equity's stamp of approval on what Wertin's counsel referred to in oral argument as "standard procedure." We are concerned with whether equity required them *in this case* to refrain from making loan payments.

[8]It is possible, of course, that sometimes the opportunity to buy an obligation at a discount can be the product of something other than a default threat. For example, a relatively long term fixed rate loan will tend to depreciate in value during a period of rapidly rising interest rates, and a lender may decide to offer the borrower a discount so that the lender can reinvest its capital more profitably elsewhere. Something of that sort may have happened in the case which we are about to discuss, *Ebest* v. *Bruce, supra*, 734 S.W.2d 915. The *Ebest* court never actually mentioned why the note in that case was subject to such a large discount, or why the lender was willing to part with the note for so low a price, particularly in light of the fact that it involved a shopping center which, at the time of the purchase, was being run at a profit. But the early 1980's time frame of the negotiations yields a clue. Because of the high interest rates that predominated in that period, it is quite possible that the market value of the

buys up the obligation is still entitled to credit for the actual amount expended and may even obtain contribution from the other partners for it. (*Thomas* v. *Schmelzer* (1990) 118 Idaho 353 [796 P.2d 1026, 1033].) *Creating* a discount, on the other hand, depends on the necessary frictional costs inherent in the legal system which controls the collection process: Even in cases of nonjudicial foreclosure, it takes time and money to collect on any obligation to repay.

Wertin's counsel have not come up with any case that stands for the proposition that partners have an affirmative duty to refrain from paying lawful partnership debts so that the partnership might thereby pressure a creditor into a discount. However, two cases relied on by Wertin, *Ebest* v. *Bruce, supra,* 734 S.W.2d 915 and *Thomas* v. *Schmelzer, supra,* 796 P.2d 1026, bear extended discussion because, if not read carefully, they might be mistakenly read for such an idea.

In *Ebest,* a partnership purchased a shopping center for $2.1 million; part of the financing was a $570,000 wrap-around negotiable purchase money note which gave the partnership a right of first refusal in the event the lender tried to transfer the note. At first the partnership ran the shopping center at a loss. Then the partnership was reorganized, with two new partners being brought in as the general partners and the old general partners becoming limited partners. The new general partners made the shopping center profitable.

At the same time—both before and after the reorganization—the old partners tried unsuccessfully to buy the obligation represented by the $570,000 note for the partnership at a large discount; one proposal went as low as 40 cents on the dollar. (See 734 S.W.2d at p. 919 [deal to buy $570,000 note for $225,000 cash, never consummated].) Then the new general partners tried their hand at buying the obligation for the partnership and succeeded, probably because they offered the lender a somewhat better deal, 52 cents on the dollar. (See *id.* at p. 920 [partners paid $295,000 for $570,000 financing].) At the last moment, however, tax counsel convinced the new general partners to acquire the note in their own names, so as to avoid "severe tax consequences to them as general partners" because the transaction would represent a sudden influx of forgiveness-of-debt income. (*Id.* at p. 922.)

At first, the new general partners did not tell the limited partners about the switch. When the limited partners found out about it they sued for breach of fiduciary duty.

partnership's obligation to the lender, *totally extrinsic of the possibility of default,* had taken a nosedive.

The trial court held that the new general partners did not breach their fiduciary duty when they took the note in their own names, but also determined they could not keep the beneficial interest in the obligation and ordered it transferred to the partnership in exchange for compensation equal to its cost. (734 S.W.2d at p. 921.) On an appeal from both sides, the Missouri appellate court reversed the judgment as to the breach of fiduciary duty, but affirmed as to the provision that the new general partners receive, in essence, reimbursement of the cost of the obligation, including the tax liability.

On the fiduciary duty point, the court noted that there was *no dispute* that the right of first refusal and the discount purchase were "valuable assets" of the partnership that the partnership had lost by the last minute switch in buyers. (734 S.W.2d at p. 922.) The chief argument of the new general partners, it appears, was that the liability of the partnership was "unaffected" by the purchase, but that contention was rejected by the court. There was evidence that the partnership indeed would have benefited from the purchase of the obligation and such a purchase "made sense" to the partnership. (*Ibid.*) The partnership's equity would be enhanced by the reduction in debt. (*Id.* at p. 923.) Accordingly, the appellate court held that the new general partners did indeed breach their fiduciary obligation. (*Id.* at p. 922.) They had, *albeit in good faith*, bought something for themselves that properly should have been bought by the partnership.

But that was not the end of the story. Even though the new general partners had ostensibly breached their fiduciary duty, there was still no need to dissolve the partnership or have an accounting. "[T]he act of acquiring the financing notes," said the *Ebest* court, "d[id] not constitute conduct tending to affect prejudicially the operation of the business." (734 S.W.2d at p. 923.) The solution was to affirm the trial court's order that the new general partners transfer the obligation in exchange for compensation. (See *id.* at pp. 923, 925.) The appellate court even added that the compensation should *include* reimbursement for any tax liability which might follow. (*Id.* at p. 925.)

Noticeably absent from *Ebest* is the idea that a partnership "opportunity" might be bootstrapped into existence by first refusing to pay a loan, then treating the discount that was negotiated with the lender as if that discount itself were a kind of triple-A rated bond which might be purchased in some financial market. Even assuming the *Ebest* court's conclusion that the partners violated their fiduciary duties would have been the correct result under California law (but see *McKenzie v. Dickinson* (1872) 43 Cal. 119, 133), there is a difference between, on the one hand, the *usual* rules—unvaried by

specific agreement—governing a partner's right to buy a partnership obligation from a lender and, on the other, the possibility of forcing a discount by defaulting on that obligation. *Ebest* is in the former category; Wertin's argument in the present case is based on the latter.

The other case on which Wertin relies is *Thomas* v. *Schmelzer, supra,* 796 P.2d 1026. *Schmelzer* does not stand for the idea that defaulting *qua* defaulting on a loan is a partnership opportunity either. Rather, the case represents the perfectly sensible proposition that a partner who buys up a *secured* obligation of a partnership cannot use the position of a secured creditor to subject his or her partners to demands for immediate repayment of indebtedness plus attorney fees incurred in preparing a notice of default.

In *Schmelzer,* two couples, the Thomases and the Schmelzers, formed a partnership in 1982 to buy, manage and rent out certain properties in Idaho. The partnership acquired three residential properties by means of three contracts from a single seller; the contracts obligated the partnership to make payments on an earlier contract. By June 1985 the two sets of partners had decided to dissolve their partnership, but no complaint for a formal accounting and winding up was filed until March of the following year. The Thomases had been doing the work of receiving the rents and paying the accruing partnership debts, and scheduled a show cause hearing for June 4, 1986 to have the Schmelzers ordered to help the Thomases pay partnership debts during the winding up period. The hearing was postponed to June 19.

Within a few days after the postponement the Thomases purchased the three contracts. But they did not tell the Schmelzers about it; in fact, at the postponed hearing held June 19 the parties stipulated to a settlement agreement in which the *Schmelzers* would buy out the Thomases' partnership interest for $25,000. It was not until about three weeks later in mid-August—just a few days prior to the trial—that the Schmelzers found out about the purchase, and then only when the Thomases sent them a notice of default on the three contracts. The Schmelzers then sought to set aside their settlement, but the trial court upheld the agreement, and it was in that posture that the Schmelzers appealed.

The Idaho appellate court spent much of its opinion explaining that the parties simply did not have a sufficient mutual understanding of the settlement's effect and terms for it to be enforced. (See 796 P.2d at pp. 1029-1032.) One of the reasons for that lack of understanding, of course, was the Thomases' secret purchase of the partnership's obligation. As the court pointed out, the Schmelzers would hardly have wanted to buy out the Thomases' interest only to find themselves in a debtor-creditor relationship. (See *id.* at p. 1031.)

Having concluded the settlement could not be enforced, the court then opined, relying on *Ebest*, that the trial court erred in ruling that the Thomases had not breached their fiduciary duty to the Schmelzers by making the secret purchase. "Through their undisclosed act," said the court, "the Thomases obtained an advantage over their partner by stepping into the shoes of a secured creditor." (796 P.2d at p. 1032.) And the advantage, it turned out, was in their new role of creditor *qua* creditor. "At least the Schmelzers suffered because they were being subject to demands for immediate payment of the contract indebtedness plus attorney fees as sought by the Thomases in the notice of default." (*Ibid.*)

But, like *Ebest*, the story of the purchase of the loan did not end with the simple finding that the purchasing partners had breached their fiduciary duty. The Thomases were to be treated as having purchased the indebtedness "for the benefit of the partnership." (796 P.2d at. p. 1032.) The legal relationship of the Thomases to the Schmelzers was thus properly not creditor to debtor, but that of partners who had the right to have their capital accounts "credited for the actual amount expended." (*Id.* at p. 1033.) And that meant the Thomases *could* obtain contribution from the other partners in an accounting. (*Ibid.*)

Nothing in *Thomas* indicates that the purchasing partners' sin was in paying off partnership obligations or in refraining from playing "hardball" with partnership creditors. Rather, their breach of fiduciary duty derived from the surreptitious assumption of the role of secured creditors of the partnership in a context where they were being bought out by their erstwhile partners. It was just too "cute" a maneuver for a court in equity to stomach. But even then the Thomases were still allowed to obtain contribution for their purchase. Like *Ebest*, *Thomas* cannot be read for the proposition that "stiffing" a third party creditor can be a fiduciary obligation imposed upon partners.

*The Possibility of Obtaining a Discount on a Loan by Threatening Default Is Not a Protected Economic Interest for Purposes of the Tort of Intentional Interference*

█ What we have already said disposes of Wertin's claim the trial court erred in concluding that his claim of tortious interference with economic advantage was meritless as a matter of law. The opportunity to "compromise AW2's and Wertin's debts with the Bank," as Wertin's brief styles it, is predicated on what economists might describe as the "frictional" costs of debt collection inflicted on a lender by an intransigent borrower. The opportunity to obtain a discount by the infliction of those costs can hardly

qualify as an "economic relationship" protected by tortious interference causes of action. The bystander who interrupts a robbery in progress may have interfered with the robber's prospective economic advantage, but that advantage is hardly one which the law recognizes as protectable. From the viewpoint of a court in equity, the opportunity to extract a discount by threat of default is not too different.

### The Preworkout Agreements Gave Each Partner the Right to Keep Whatever Collateral Benefits Concerning Their Own Loans Might Be Obtained From the Purchase of the Partnership Debt

█ Wertin asserts not only that Argyros co-opted a partnership opportunity when he and Ball made payments on AW2 loans, but also that he *may have* co-opted a partnership opportunity for a discount on the AW2 loans when he purchased the partnership's unsecured debt. In particular, Wertin alleges that Argyros, in purchasing the unsecured debt of the partnership, might have shifted a discount to himself which otherwise would have been offered to the AW2 partnership. Because the purchase occurred after trial commenced, Wertin claims it was error for the referee (and later the trial court) not to allow further discovery into the issue.[9]

We need not deal with the question of the degree to which Wertin's "shifting discount" contention implicates the same equitable concerns raised by his argument that the partnership should have united to avoid paying a lawful debt. Nor do we deal, in this case, with a situation where partners have not modified by agreement fiduciary duties which they might *otherwise* have owed each other.[10]

Wertin's argument fails in this case because Wertin, Argyros and Ball—in contrast, for example, with the partners in *Ebest*—*by agreement* gave themselves the right to keep whatever benefits concerning their own loans might come their way as a result of purchasing the partnership debt at face value.

---

[9]Here is the trial judge's characterization of the argument, uttered in the context of a motion to quash a group of subpoenas served on certain employees and officers of Bank of America. He asked Wertin's counsel what those witnesses would say if they testified as Wertin's counsel hoped they would:

"The Court: Let me tell you what you are going to tell me. You tell me if I'm wrong.

"B of A's going to testify: Argyros and/or Ball came in here, and we got into a very, very smoke filled dark room where we all said the following: Let's cut Argyros a deal on loans A, B, C and D and reduce his debt on those because he's a big debtor, he's a big borrower, big guy, and then we'll leave the nine-and-a-half-million-dollar AB group 2 intact and assign our rights to him pursuant to this deal wherein he pays a little bit of money, and we give him a lot of slack on other loans, and that's the deal.

"Mr. Greenberg: Precisely."

[10]Hence we need not opine whether, absent agreement, what Wertin has alleged would constitute a breach of fiduciary duty.

We have already mentioned that the guarantees afforded Argyros, Ball and Wertin the right "to purchase all but not less than all" of the AW2 loans. The preworkout agreements, which came later, were equally plain in providing that any party could "negotiate" any course of action with any other party regarding existing debts, not related to the partnership debts.

The preworkout agreements expressly contemplated side deals between various of the parties in paragraph 2. Their sixth paragraph contemplated "separate discussions and negotiations" regarding each of the partner's "other agreements with or obligations to" the bank, and paragraph 7 provided that nothing said or done in the workout discussions could create any liability to the others: "All evidence of *conduct* and communications *of any nature whatsoever* . . . of any Party in connection with the Workout Discussions contemplated by this agreement or in any recent meetings or correspondence relating to possible modification of the Loan Documents or restructure of the Obligations of the Loan Parties shall be inadmissible *for any purpose whatsoever* in any judicial or similar proceeding." (Italics added.)

Paragraphs 2, 6, and 7, as well as the rest of the contract must, of course, be read together. (Civ. Code, § 1641 ["The whole of a contract is to be taken together . . . ."]; *Milzazo* v. *Gulf Ins. Co.* (1990) 224 Cal.App.3d 1528, 1536 [274 Cal.Rptr. 632] ["the portions of a contract . . . are read together as a whole, using the various clauses to help interpret the others"].) Because paragraph 2 contemplates actual side deals between various of the parties, it is inescapable that the "separate discussions and negotiations" mentioned in paragraph 6 necessarily entailed the possibility of consummated side agreements between each of the partners and the Bank of America regarding his own "other" obligations to the bank. And any doubt as to the breadth of each partner's ability to negotiate and make agreements with one of the other parties was removed by the exceptionally broad language in paragraph 7, which went so far as to make any "conduct" in connection with the restructuring of the obligations of the loan parties beyond judicial purview.

The partners thus contracted with each other to create two rights: In the guarantee, they each acquired the right to buy the debt for face value; in the preworkout agreements, they acquired the right to make whatever deals they could with regard to their *other* loans with the bank.[11] There is absolutely no indication in the preworkout agreements that they were intended to abrogate

---

[11]The present case is only one of three separate appeals now before us involving development ventures between Argyros, Ball and Wertin. (The two other appeals are the subject of nonpublished opinions filed concurrently with this one.) Respondents have requested that we take judicial notice of certain trial court rulings and the preworkout agreements found in the

or curtail the existing right in the guarantees to purchase the loan at full face value. But if both rights were to meaningfully coexist, it could only be by allowing the partner who purchased the debt at full face value to keep any benefits as regards his other loans incidentally (or even directly) accruing to him from the purchase of the AW2 loan at full face value. After all, it is only common sense that any banker is going to be happy to have a bad loan purchased at full value, and may thereby be more agreeable to, as the trial judge put it, allowing the borrower some "slack" elsewhere. If the partner who purchased the loan could be held liable for any benefits he might obtain in separate negotiations regarding his own loans, then the right to enter into those negotiations in the first place would have been rendered illusory. Thus even if Argyros received some sort of benefit from the purchase of the AW2 loans, the preworkout agreements necessarily contemplated that he would be allowed to keep that benefit.[12]

Perhaps in contemplation of the fact that Argyros had a contractual right to whatever benefits might accrue from the purchase of the partnership debt at face value, Wertin focuses his attack on a point extrinsic to the texts of the guarantee and preworkout agreements: He argues that the parties could not legally have agreed to what they evidently agreed to, and he should not be held to have consented to it in any event, because it would authorize violations of what would constitute the partners' fiduciary duties toward each other. The contention is not persuasive.

*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342 [6 Cal.Rptr.2d 467, 826 P.2d 710] sets forth the applicable rule. *Carma* involved a termination and recapture clause of a lease which expressly allowed the lessor to pursue a new lease with a proposed sublessee directly without sharing any profit from increased rental value with the lessee. (See *id.* at p. 374.) The lessee argued that the implied covenant of good faith and fair dealing implied into every contract prohibited the lessor from invoking that right. (See *id.* at pp. 373-374.) Our high court rejected the argument. The basic rule is that parties may, by contract,

---

other cases. We take judicial notice only of the preworkout agreements, which are just as relevant to the present appeal as they are to the others. There is no reason to take judicial notice of anything else.

[12]The guarantee expressly gave each partner the right to purchase the *debt* at the full amount, but not less. The preworkout agreements, by contrast, are broader, expressly allowing the partners to make whatever deals they could with the bank. While it might be possible to argue that if Argyros received a discount or some other benefit on his other loans it meant that he did not pay the full face amount of the AW2 loans (in contravention of the very terms of the guarantee itself)—an argument, incidentally, not made by Wertin's exceptionally able counsel—the argument would have been unavailing even if it had been made. There is no other way that a court can give effect to both the right to purchase the partnership debt at full value *and* the right to make whatever deals might be made with regard to other loans.

allow themselves to do acts which would otherwise contravene the implied good faith covenant. (See *id.* at p. 374.) Accordingly, the lessor was perfectly within its rights to terminate the lease and claim for itself increased rental value otherwise due the lessee, an act which the trial court had deemed arbitrary and capricious. (*Id.* at p. 376.)

True, *Carma* is a contract case and not a fiduciary duty case. Nevertheless, it demonstrates that the law does not fall into the ditch of never allowing parties to vary duties otherwise imposed by law. Partners or joint venturers often have a legitimate business need to modify duties imposed by law in discrete, limited ways. That need is reflected in section 15018 of the Corporations Code, which states that the rights and duties of partners are "subject to any agreement between them."

The construction industry in particular illustrates the need for a certain amount of contractual flexibility in partnership arrangements. Partnership or joint venture agreements between developers often involve parties who are already business competitors. Like the parties here, they often have their fingers in many pies and have (unlike, say, a traditional law firm partnership) united their resources for a specific project only. Economic efficiency is promoted when such partners are able to modify fiduciary duties to accommodate their unrelated business. (The typical example is an agreement which allows the partners to continue to compete with each other outside the partnership project.) Without that freedom, such partnerships or joint ventures might never be formed, and the jobs and wealth later created never brought into being.

Wertin acknowledges that partners have the right, by statute, to structure their own relationships. He implies, however, that the agreement here contravenes a principle set forth in certain out-of-state authorities to the effect that partners are not free to make agreements which "destroy" the "fiduciary character" of the partnership relationship. (See *Appletree Square I* v. *Investment, Inc.* (Minn.Ct.App. 1993) 494 N.W.2d 889, 893, and authorities cited therein.)

There is no need here to explore in detail the restrictions which California law might, for sake of argument, place on partners who chose to structure their relationship in nontraditional ways. The agreements in *this* case come nowhere near the "destruction" of the "fiduciary character" of the partnership arrangement. The reduction in fiduciary responsibility here involved transactions fundamentally unrelated to the partnership business—each partner's separate loans with the bank—which left the basic partnership arrangement *with* its fiduciary character intact.

*Appletree Square I* v. *Investment, Inc., supra,* 494 N.W.2d 889, 893, relied on by Wertin, is distinguishable, even if it correctly articulated the law in California. *Appletree Square* arose out of the sale of an asbestos-ridden building by former general partners to a group of limited partners. The general partners did not disclose the asbestos contamination, and when they were sued for their nondisclosure, argued their partnership agreement only obligated them to disclose material information when *asked,* and, of course, they were never asked. The court rejected the defense, for two reasons. First, contract clauses designed to shield wrongdoers from liability would not be enforced; second, the partners could not "destroy the fiduciary character of their relationship" plus "invite fraud." (*Ibid.*)

In *Appletree Square,* the action by the general partners was not specifically authorized by contract; indeed, it was little short of an outright swindle. The nondisclosure went to the basic core of the partnership arrangement—the asbestos-ridden office building was the very property that the partnership had been formed to purchase and operate. (See 494 N.W.2d at p. 891.)

In contrast with the partners in *Appletree Square,* the right of each partner to make whatever deals he might with the bank as regards his own loans did not imperil the basic objective of the partnership. In the present case the partners necessarily knew that the *worst* that could happen was that a discount (or, more precisely, the opportunity to extract a discount) might be lost in the process of paying off the partnership debt, with one partner gaining favor with his banker at the same time. That is nowhere near allowing one group of insider partners to sell a group of outsider partners a diseased pig in a poke. Nobody bargained for an asbestos-ridden building in *Appletree Square.* The same cannot be said of the right to purchase the partnership debt and obtain whatever incidental benefits might come out of it, as is the case here.

In sum, as the *Carma* court might have put it, Argyros's purchase of the unsecured debt was "expressly permitted" by agreement and "within the parties' reasonable expectations."

### *Argyros Was Entitled to Credit for the Purchase of the Unsecured Debt*

The final point raised by Wertin is that he should not be personally liable for one-half the partnership's unsecured debt purchased by Argyros by virtue of Wertin's guarantee to the bank. Wertin argues that he was only obligated, as a matter of his partnership agreement, to match capital contributions or debt payments, and Argyros's *purchase* of the unsecured debt was neither. He claims that to allow Argyros to enforce the guarantee was to give him

more rights than he was entitled to as a "third party creditor" of the partnership, i.e., Argyros had no right to enforce the purchased guarantee in the forum of a partnership accounting. We reject the argument both as a matter of substance and procedure.

As to the substance of matter, it is a distortion, given the facts and circumstances of this case, to style Argyros as a third party creditor. The distinction between the purchase of a debt and its payoff is artificial here, given that Wertin specifically agreed that he and his partners, Argyros and Ball, would each have the right to purchase the debt for its face value. Inherent in that agreement was the implication that such a purchase would amount to the payoff of the debt. And in that regard the applicable rule of law is that a partner who pays more than his share of a partnership obligation has indeed made a capital contribution to the partnership and is thus entitled to credit for it as a partner. (See *Kazanjian* v. *Rancho Estates, Ltd.* (1991) 235 Cal.App.3d 1621,1627 [1 Cal.Rptr.2d 534] ["A partner who has paid more than his share of partnership obligations is entitled to indemnification from the partnership."]; cf. Corp. Code, § 15040, subd. (d) [on dissolution, partners shall contribute the amount necessary to satisfy the liabilities of the partnership].) Because Argyros made, in substance, a capital contribution by purchasing the debt, he was entitled to indemnification from the partnership; the *partnership's* obligation to Argyros then could be enforced against Wertin personally as a matter of his partnership obligations independent of his guarantee to the bank.

Ironically enough, both *Ebest* and *Thomas*, relied on by Wertin, illustrate our point. In *Ebest*, the court held not only that the purchasing partners had to transfer the obligation they had acquired to the partnership, but also that the partnership had to *reimburse* them for the expense of acquiring it, including any increased tax liability. (*Ebest* v. *Bruce, supra*, 734 S.W.2d at p. 925.) *Thomas* followed the same pattern of transfer and reimbursement. There the court plainly stated that, "The partner purchasing a partnership obligation has the right to have his capital account credited for the actual amount expended and may obtain contribution from the other partners in an accounting." (*Thomas* v. *Schmelzer, supra*, 796 P.2d at p. 1033.)[13]

Moreover, as a procedural matter, Argyros was entitled to have any claim against Wertin based on Wertin's guarantee to the bank enforced in the

---

[13]Throughout this case and in his appellate briefs, Wertin has treated Argyros and Ball, who are technically affiliates guaranteeing the obligations of partners, as de facto partners for purposes of whether they breached a fiduciary duty by buying the AW2 partnership's debt. His position of claiming no personal liability runs directly counter to his position on the fiduciary duty question.

partnership accounting. "Equity does nothing by halves . . . . When it undertakes to adjust the differences between partners, it adjusts them all." (*Prince* v. *Harting* (1960) 177 Cal.App.2d 720, 732 [2 Cal.Rptr. 545]; *Mashon* v. *Haddock* (1961) 190 Cal.App.2d 151, 175 [11 Cal.Rptr. 865] [quoting *Prince*].) A court of equity has the power to cut through the fog of artificial distinctions and allocate claims and setoffs as between the real, beneficially interested parties. (See *Hobbs* v. *Duff* (1863) 23 Cal. 596, 629 [". . . we think it clear that a set-off should be made in equity as between the real parties in interest, even though one of the judgments is in the name of a trustee who holds for the use and benefit of such real parties."].) The trial court was thus not, in equity, required to divest itself of the question of Wertin's liability on his bank guarantee and reserve it for yet further litigation. It was perfectly proper for it to adjust all the differences between the partners pertaining to the AW2 partnership in the accounting action, including the question of Wertin's personal liability.

## CONCLUSION

Equity will not recognize as a partnership opportunity the possibility of leveraging a discount from a lender by the threat of nonpayment. Nor is such a possibility a legitimate economic interest protectable from tortious interference. Partners may, however, agree among themselves that they may purchase partnership debts at full value, even if that means the purchasing partner will obtain grace and favor with the lender and that goodwill helps the purchasing partner with his or her own outside business dealings. The judgment is affirmed. Respondents are to recover their costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.

The petition of all appellants for review by the Supreme Court was denied March 11, 1998.