726 P.2d 685

**L.L. MURGOITIO, Plaintiff-Counter Defendant, Appellant-Cross-Respondent,**

v.

**J.C. MURGOITIO, Defendant-Counterclaimant, Respondent-Cross-Appellant,**

and

**J.C. Murgoitio and L.L. Murgoitio, Personal Representatives for the Estate of R.G. Murgoitio, Defendants-Respondents,**

and

**Anna Potts, one of the Personal Representatives of the Estate of R.G. Murgoitio, deceased, Defendant-Respondent, Cross-Appellant.**

**L.L. MURGOITIO, Plaintiff-Appellant,**

v.

**J.C. MURGOITIO, and J.C. Murgoitio, L.L. Murgoitio and Anna Potts, Personal Representative of the Estate of R.G. Murgoitio, deceased, Defendants-Respondents.**

**Nos. 14636, 15241.**

Supreme Court of Idaho.

April 24, 1986.

Rehearing Denied Oct. 15, 1986.

Glenn A. Coughlan, of Coughlan, Coughlan & Korn, and Frank Stoppello, of Stoppello & Hampton, Boise, for plaintiff-counter defendant, appellant-cross-respondent.

Merlyn W. clark, Esq., of Hawley, Troxell, Ennis & Hawley, Robert M. Tyler, Jr., Melville W. Fisher II, and Bobbi K. Dominick, of Elam, Burke & Boyd, and Stanley A. Welsh, of Clemons, Cosho & Humphrey, Boise, for defendants-respondents.

DONALDSON, Chief Justice.

This case involves the dissolution, winding-up and termination of a family partnership. In the early 1900's, J.H. Murgoitio

(James) immigrated to the United States from Spain and began a small dairy operation on a 40-acre tract of land (the Home 40). James had three sons: R.G. (Ray), L.L. (Lou), and J.C. (Joe). At a relatively early age, Ray was seriously injured in a fire. His injuries hampered his activity in future years. As the sons grew up, they gradually accepted more responsibility for the dairy operation, and ultimately a partnership arrangement was formed in which each of the four men had a 25% interest.

It was the practice of the partnership to raise feed for the dairy cattle on property it either owned or leased. Over the years, the size of the partnership operation increased. In 1942, James purchased two parcels of land: the Kellogg 80 and Kellogg 40. On November 27, 1944, James executed a deed for the Kellogg 80 naming Lou as grantee and a deed for the Kellogg 40 naming Ray as grantee. On that same date, Lou executed a mortgage to Joe encumbering the Kellogg 80. In 1947, James purchased another parcel of land, the Boyce 40. On November 6, 1947, he executed a deed conveying the Boyce 40 to his three sons.

In 1952, the three sons purchased their father's interest in the partnership. On April 1, 1952, in connection with that purchase, James conveyed the Home 40 to his sons. On that same date, all three sons executed a mortgage back to James encumbering the Boyce 40, Home 40, Kellogg 80 and Kellogg 40 to secure their obligation to James for his interest in the partnership. The sons then formed a new partnership with Lou and Joe each holding a 40% interest, and Ray a 20% interest. No written partnership agreement was ever drafted.

Throughout the 1950's and 1960's the partnership continued to grow and acquire additional parcels of land. Although this newly acquired property was deeded to the individual partners, rather than to the partnership, the partnership was the only source of income for any of the partners and the new property was all acquired with partnership funds. The income from the property went into the partnership, and all expenses and improvements were paid for with partnership funds.

During this same period of time, the partnership began a small feed lot operation on the McBirney 160 where Joe's home was located. Over the years the size of the feed lot grew and Joe assumed primary responsibility for its operation, while Lou supervised the original dairy operation. Both Joe and Lou participated in farming the partnership property and the crops raised were used to feed both dairy and feed lot cattle.

The partnership continued to grow during the 1970's. Joe's and Lou's sons began to assist in the partnership operation with Joe's family running the feed lot and Lou's the dairy. Ray's health deteriorated and he was unable to be actively involved in the management of the partnership. Lou and Joe each obtained individual sources of financing for their respective operations, but continued to share the proceeds of the financing, transferring funds between accounts as different operations required capital.

In 1978, Lou declared to his brothers that he was dissolving the partnership effective December 31, 1978, and on August 14, 1979, he initiated this action seeking the court's assistance in winding-up and terminating the partnership. Ray died intestate on December 11, 1979, survived by his two brothers and two sisters, Anna and Margaret. Joe and Lou were initially appointed personal representatives for Ray's estate. On August 7, 1981, Anna was added as an additional personal representative, and one week later was made a defendant in this action in her capacity as co-personal representative.

During the course of the hearings on winding-up the partnership, a dispute arose as to the ownership of the real property. Lou asserted that the property belonged to the individual partners according to the record title, while Joe and the estate took the position that the partnership owned all the real property. The parties agreed to a separate trial on the issue of ownership of the real property and a trial on that issue

commenced on August 28, 1981. In a Memorandum Decision dated October 5, 1981, the trial court concluded that all the real property (approximately 875 acres) was owned by the partnership, rather than by the partners individually.

On October 22, 1981, trial commenced to determine the value of partnership assets and the best method for winding-up and terminating the partnership. During the course of the second trial, the parties stipulated to ownership of some of the personal property. On May 14, 1982, the trial court entered a Memorandum Opinion regarding the winding-up and liquidation of the partnership.

The court concluded that the evidence before it did not establish the precise value of any of the partnership real property which value could be used as a basis for distribution in kind. Accordingly, the court determined that the most equitable method of liquidating the partnership would be to first distribute the assets of the dairy and feed lot businesses to Lou and Joe, respectively, and then to sell all the realty at public sale, allowing the surviving partners a preference to acquire the real estate associated with their businesses. Based on the court's determination that the value of the partnership exceeded $6 million, each of the surviving partners was given a $2.5 million credit to use in bidding on the property. In addition, Lou and Joe were given a "first opportunity to buy" the property on which their operations were located at the highest value supported by the evidence within 30 days of the entry of judgment. The partners were required to account to the partnership for their use of partnership property until the date of sale.

On June 8, 1982, Lou filed a Notice of Appeal with this Court (Case No. 14636). Both Joe and Anna filed cross-appeals. On October 15, 1982, we remanded the case to the district court for certification pursuant to I.A.R. 12, or for entry of findings, conclusions and judgment, and suspended further proceedings in this Court.

The trial court entered two Memorandum Opinions on December 14, 1982 and May 27, 1983. The May 27 opinion concluded that the entry of findings, conclusions and judgment, rather than an I.A.R. 12 certification, was appropriate, and directed Joe to submit the proposed findings and conclusions and a final judgment consistent with that opinion.

On August 30, 1983, the findings of fact, conclusions of law and judgment were entered. The court declared that all partnership operations had ceased as of October 22, 1981, the date of the second trial. Because the parties were unable to agree on any distribution of partnership assets, other than machinery and equipment, and because the court felt it would be inequitable to terminate the partnership until all of the assets were completely liquidated or distributed, it proposed a plan for winding-up and terminating the partnership designed to allow the surviving partners to preserve the value of their respective homes and businesses. In essence, the surviving partners were to continue to operate their individual businesses, and to remain in possession of the real property they controlled until sale or distribution. In return, the partners were to pay a reasonable rent to the partnership for the use of the partnership land and the improvements thereon from the date of cessation of partnership operations (October 22, 1981) until the date of sale. Title to the personal property was distributed to the partner using the property, and he was in turn required to pay interest to the partnership for its use from the date of distribution until the date of termination. A receiver was appointed to conserve and manage the partnership. His duties included collecting the rent and interest and conducting the sales of the real property. The partnership was to be terminated as of the date of the final sale of the real property.

On September 28, 1983, Lou filed appeal No. 15241 from the August 30, 1983 judgment. Lou also moved the trial court to stay the execution of the judgment pending a resolution of this appeal. The court ultimately granted the stay of execution as to those provisions of the judgment requiring

Lou to pay rent for the use of partnership land prior to September 15, 1983, and interest for the use of the partnership personal property prior to June 15, 1983. The court held, however, that if Lou did not pay rent for the real property he retained after September 15, 1983, the receiver would be allowed to rent it to others.

On appeal, Lou argues that the trial court erred in two major respects: first, in finding that the real property was owned by the partnership rather than the individual partners, and, second, in requiring the partners to pay rent and interest for their use of partnership property distributed to them prior to the termination of the partnership. We will address each issue in turn.

I

**Ownership of the Real Property**

■ The Uniform Partnership Law, specifically I.C. § 53–308, provides that all property originally brought into the partnership stock, or subsequently acquired on the account of the partnership is partnership property. The statute provides that unless a contrary intent is shown, property acquired with partnership funds is presumed to belong to the partnership. I.C. § 53–308(2). According to the case law interpreting this section, the ultimate determination of whether an asset is partnership property depends on the parties' intent. *Shumway v. Shumway,* 106 Idaho 415, 421, 679 P.2d 1133, 1139 (1984).

In the instant case, the testimony of the two surviving partners is diametrically opposed on the question of the parties' intent as to the ownership of the real property. The appellant, Lou, contends that the partnership extends only to the actual operation of the dairy and feed lot businesses. It is his position that the partnership owns only the personal property and not the real property. He asserts that the partners took personal draws from the partnership to purchase the real property, and that the record title reflects their intent as to ownership. The respondents, on the other hand, contend that the partnership owns all

the property, both real and personal. It is respondents' position that title was taken in individual names only as a matter of convenience, and that the partners intended to own all of the real property on the same 40–40–20 basis as the personal property.

The question of the parties' intent was a question of fact for the trial court. *See Shumway, supra* at 421, 679 P.2d at 1139. The trial court resolved the question in favor of respondents, finding that the partners intended the real property to belong to the partnership. Our task on appeal is to determine whether this finding is supported by the evidence. Findings of fact by a trial court will not be disturbed on appeal unless they are clearly erroneous. I.R.C.P. 52(a). Clear error, in turn, will not be deemed to exist if the findings are supported by substantial and competent evidence. *See, e.g., Rasmussen v. Martin,* 104 Idaho 401, 404, 659 P.2d 155, 158 (Ct. App.1983).

The record reveals the following evidence in support of the trial court's finding that the real property was owned by the partnership: All the property—aside from the Kellogg and Boyce properties which were purchased by James and subsequently deeded to his sons—was purchased with partnership funds. The partnership made both the down payments and all of the mortgage payments. The partnership paid the taxes, insurance and maintenance on the property. After acquisition, much of the property was substantially improved. All the improvements were made with partnership labor or with labor and materials paid for by the partnership, and the improvements were depreciated on the partnership tax returns. Similarly, the taxes, insurance and maintenance were deducted as partnership expenses. In addition, the real property was occupied, managed and used as an integral part of the partnership businesses. The crops raised on the property were consumed in either the dairy or the feed lot; any excess was sold and the income went to the partnership. The partnership did not pay any compensation to

the individual partners for its use of the properties.

The transcript of the early hearings in this case indicate that all of the partners initially agreed that the partnership owned both the equipment and the real property, and that Lou initiated this action seeking an equitable way to divide the same. Lou's complaint states that "said partnership owns *substantial real property*, livestock, machinery and equipment" and prays that the property be partitioned between the partners. (Our emphasis). In the initial hearing on this matter on October 24, 1979, Lou testified as follows:

"Q. Has there ever been any contention on your part that the real property involved in this partnership has not been owned on a 40–40–20 basis?

"A. That's the way we filed income tax, so I think that's probably on more or less the record.

"Q. How about title to the property, Mr. Murgoitio? Do you have that in the partnership name, or how does that work?

"A. No, we don't, sir. We—as we bought this property, we kind of had more or less a—two separate operations, actually, according to the way of the financing of it. At one time, we had a joint account, and then we—we resolved that and we went into a separate accounts [sic] and he borrowed money at one bank and I borrowed at another, and so it more or less was pretty confusing at times.

"Q. Is the title owned between you in some way or is it just random?

"A. Sir, some of the properties are in my name, some of them are in R.G.'s name, some of them are in J.C.'s name, some of them are in J.C. and my name, and some of it is in J.C., L.L., and R.G. All three of them. So it's been quite a collaboration."

It appears from the record that at some point during the litigation process, Lou changed his initial position and began asserting for the first time that the partnership did not, in fact, own any real property.

It is now Lou's position that the deeds reflect the parties' true intent as to ownership and that they are controlling on this issue. He does not, however, make the same contention with respect to the equipment which, like the real property, is held in individual names.

"Q. I think Mr. Clark asked you a question earlier and let me clarify it in my mind too, there's farm equipment held in ... names of just you, right, titles in you, true?

"A. Yes, sir.

"Q. And the same thing with Joe, right?

"A. Yes, sir.

"Q. But the property is partnership property even though it's titled in your name or Joe's name, right?

"A. Yes, sir.

"Q. Okay.

"A. We need that property for the operation of the farms."

■ While we recognize that there was a great deal of conflicting evidence on this issue, we note that the task of weighing such evidence is within the province of the trial court. *Rasmussen, supra* at 405, 659 P.2d at 159. The trial court's finding that the real property was owned by the partnership is supported by substantial and competent evidence and is not clearly erroneous and will, therefore, be upheld on appeal.

## II

### Rent and Interest

Lou contends that the trial court erred in charging the surviving partners rent and interest for their use of partnership property during the winding-up period. At the time of trial, Lou was in possession of approximately 450 acres of farm land and the dairy operation. Joe was in possession of approximately 350 acres and the feed lot operation. Ray's estate was not in posses-

sion of any partnership property. As noted above, the trial court fashioned a plan for winding-up the partnership which allowed the two surviving partners to remain in possession of the property they controlled and to continue to operate their individual businesses during the winding-up period. The personal property was distributed to the surviving partners. The net value of this property was then treated as an account receivable of the partnership and the partner who received the property was required to pay interest on that amount. Each surviving partner was allowed to remain in possession of the real property he controlled. The court determined a reasonable annual rental value for each parcel of real property and the partner in control of a particular parcel was required to pay that amount.

A partner who uses partnership assets during the winding-up period is accountable to the partnership for any benefit or profit derived from such use. I.C. § 53–321. *Burnham v. Bray*, 104 Idaho 550, 557, 661 P.2d 335, 342 (Ct.App.1983). Lou contends that the only permissible method of accounting for benefits and profits received during the winding-up period is through an adjustment to each partner's capital account upon liquidation. The individual partners account to the partnership for any benefits or profits they have received and their capital accounts are adjusted accordingly.

The problem with Lou's analysis is that it presupposes it is always possible to account for partnership profits after dissolution. As the present case dramatically illustrates, that is not always true.

During the trial and hearings in this case it became painfully apparent that it was impossible to account for the profits of the partnership businesses after the date of dissolution. First, there were no physical inventories which could be used to determine the value of partnership assets as of the date of dissolution. After one and a half years of dispute, the court was able to value the personal property as of October 22, 1981, the date of the second trial.

However, it was not possible to reconstruct an account for the operations of the surviving partners from October 22, 1981, forward. Monthly operational reports showed only the cash flow and there were no other records from which the court could accurately account for the use of the partnership property until sold.

The two surviving partners had allowed their sons to use partnership equipment, machinery, supplies and labor without maintaining adequate records thereof. The evidence also showed that Lou allowed the leases on lands formerly farmed by the partnership to be transferred to his sons without the knowledge or consent of his partners. Following dissolution, Lou refused to adequately weigh the crops harvested on the partnership lands under his control, and, therefore, it was impossible to account for the value of those crops.

In fact, the record reveals that Lou failed to cooperate with the court throughout these proceedings. He refused to render accountings of partnership operations under his control and would not permit Joe to inspect partnership property. The trial court found that Lou had an unquestionable duty to account and to permit inspection, and that he willfully and repeatedly violated those duties in contempt of the court's orders.

At the center of this law suit is a 210-acre tract of prime farm land on South Maple Grove Road known as the Paris Place. The dairy facility is located on one corner of this tract and Lou's home is across the road from it. Neither surviving partner is willing to let the other have the Paris Place. Lou maintains that it is an integral part of his dairy operation and, therefore, must be distributed to him. Joe, on the other hand, asserts that the farm land is easily severable from the few acres composing the dairy facility. He maintains that this farm land is by far the most productive the partnership owns and is not willing to let Lou have it. Lou and Joe have battled over the Paris Place since the inception of this action and neither is willing to give an inch. The situation has even

escalated to the point of physical confrontation on at least two occasions.

The partners' extreme animosity has resulted in a situation where the partner out of possession of a particular piece of partnership property has no knowledge of, or participation in, its management. Meanwhile, in the three and one-half years between Ray's death and the date of judgment, the estate has yet to receive a single distribution from the partnership.

The foregoing made it clear that the normal method of compensating the partnership for the partners' use of partnership property during the winding-up period—adjustments to the partners' capital accounts upon liquidation—was unavailable. Equally clear was the fact that the partners had a statutory obligation to account for any benefit received from such use. The trial court was thus faced with the necessity of finding an alternate method which would allow the partnership to share in those benefits.

I.C. § 53-305 provides that in any case not provided for under the Uniform Partnership Law, the rules of law and equity shall govern. In the instant case, the trial court—finding no provisions for dealing with such a situation under the Uniform Partnership Law—fashioned an equitable solution. That solution provided compensation to the partnership for the individual partner's use of the partnership's real and personal property until a final division of the partnership's capital could be accomplished. It allowed both Lou and Joe to continue to run the businesses they individually controlled and enabled them to continue to earn a living during the pendency of this action. It eliminated the need to trace the use of partnership assets by nonpartners, which the trial court found would be impossible to do, and allowed the surviving partners' children to continue to use partnership assets without the necessity of accounting therefor. It made it unnecessary for the receiver to assume control of the dairy, feed lot and farming operations, and thus saved the partnership a considerable sum. Finally, it provided some compensa-

tion to the estate which, as noted above, had yet to receive any benefit from the partnership, and which had been forced to take out a loan to pay overdue estate taxes.

Under the unique factual situation of the present case—where it was impossible to account for the partnership's profits during a prolonged period of winding-up—we cannot say that the imposition of rent and interest during that period was improper. We have considered the rest of the appellant's contentions on appeal and find them to be without merit. Accordingly, the decision of the trial court is affirmed.

Costs to respondents.

No attorney fees on appeal.

BISTLINE and HUNTLEY, JJ., and McFADDEN and WALTERS, JJ., pro tem, concur.

BISTLINE, Justice, specially concurring.

Our first concern with this controversy was with a motion to dismiss the June 1982 appeal for failure to comply with either I.R.C.P. 54(b) or I.A.R. 12. To my surprise, the motion was denied and appellants were given the opportunity to retreat to the district court in order to obtain proper certification. This was a complete break with precedent, but the Court minutes will reflect that Chief Justice Bakes had three other votes when he signed the order—mine being not one of the four.

The original Supreme Court file in this case stacks at least ten to twelve inches—which is not including the record and transcripts certified here from the trial court. In the almost four years the controversy has been in this system, we have been confronted with a great number of motions—some of little consequence, but at least one of much consequence—as we would later hear more at oral argument. This was a motion filed by appellant, L. Murgoitio on November 10, 1983, which sought a stay of the final judgment in one respect, that being that L. Murgoitio was required to pay rent to a court-appointed receiver on allegedly partnership property which was in the possession of L. Murgoi-

tio, notwithstanding that he had filed a $300,000 appeal bond. All other portions of the final judgment had been stayed by the district court. The motion, supported by affidavits, gave a good summary of the reasoning and objective sought.

In order to preserve the status quo of this case it is necessary that this court stay the one portion of the judgment entered in the lower court requiring the payment of rent. Although all other portions of the judgment have been stayed the court did not stay that portion dealing with rent. As is noted above and in the Affidavit of the Appellant if this court refuses to stay that portion of the lower court's judgment dealing with the payment of rent it will be necessary to commence liquidation of the business. The Appellant should not be required to commence liquidation of his business unless he is unsuccessful on appeal and until after this court has fully heard this matter especially since he has posted a $300,000 bond.

The motion for a stay was strongly opposed. The Supreme Court file on this motion alone appears to be at a glance at least in excess of 150 pages. Eventually it was denied, but only after having received considerable consideration and discussion by the full court membership.

All of which is to say only that there were important decisions made in this case long before January 1986 oral argument by counsel who were addressing a court panel, two of the members of which had not participated in the earlier days. I do not suggest that they are disadvantaged by reason thereof. What I do say is that, for myself, I have joined the opinion of the Court because of an inability, presently, to analytically point out that it is in error. To feel entirely comfortable with our opinion would require a more in-depth review than time has permitted under the Court's rules which are ever-increasingly attuned more to quantity.

In particular, while my concern is a general one addressed to all of the issues on the appeal, a genuine worry is the challenge to the trial court's imposition of rental and interest—which was indirectly decided, or, at the least, forecast when the stay order was denied—and which, as the brief of L. Murgoitio argues is unsupported by statutory or case law, and asserts has here resulted in the bankruptcy of a partner in what was a financially sound partnership.

Another large concern here—one which apparently troubles me alone, is the failure of the parties, and in turn the trial court, to bring in the wives whose names appear on some of the deeds of acquisition. It is more than a matter of parties, and would also seem to bear heavily on the weighing of the evidence. It is readily understood that ownership of the various parcels in a husband and wife marital community would not necessarily be at odds with the wife (wives) allowing the husband to commit that property to a partnership venture, *i.e.*, a business arrangement. Much difficulty is experienced in comprehending how the proceedings below can be said to have divested a married woman of her interest in real property—which was conveyed naming her as a grantee—in a lawsuit to which she was not party.

In sum, to my mind, this is a case where the Court's production rules should be relaxed and our judgment withheld until enough time has been allowed to provide a more certain feeling that the issues are fully understood and adequately addressed. Presently, my own belief is that there is more involved than just a factual equation as to how the parties intended the property to be owned, *i.e.*, individually or as partnership property.

Our opinion makes no mention whatever of Part III of the L. Murgoitio Appellant's Opening Brief, where issue is drawn as to the preparation of the trial court findings. The factual background here is unlike any other which we have before considered. As the district court itself wrote, in passing on plaintiff's objections to the findings:

Plaintiff objects that the findings and conclusions have been prepared by coun-

sel for the defendant J.C. Murgoitio. This court is without word processing equipment or even secretarial assistance, except as available through the Office of the Clerk of the Court. In view of the fact that the decision here is extensive and detailed the court took advantage of the offer of defendant's counsel to prepare the findings, conclusions and judgment by use of counsel's word processing equipment and *secretarial help.* Following the preparation of the same, this court reviewed the findings, the conclusions and the judgment carefully, and made certain changes in wording; the documents were then retyped with the help of counsel's word processing equipment and secretarial help and checked by the court. In view of the voluminousness of the documents necessary here, required by the extensive proceedings which were covered in them, I feel that it was practical and appropriate to accept such assistance in order to facilitate preparation and processing of this matter particularly in view of the appeal which has been pending in this matter for some considerable time. R., p. 565–566.

This may very well be the time, if ever, to completely take trial advocates out of the function of preparing a trial court's findings of fact and conclusions of law. This Court has admonished against the practice, but the practice continues. Here it may have reached its zenith.

One may well wonder at the propriety of one party to a lawsuit, either party, offering the resources of his or her firm's office to a trial judge, and one may be equally quizzical where that offer is accepted. How does counsel for the other (losing) party explain this to his client?

This is not to suggest that anything improper takes place. But it is to suggest that it is an arrangement that the public at large may well view with a jaundiced eye.

Apparently, I am alone in my bewilderment. And, standing in isolation, I would hesitate to reverse on that basis alone.