111 P.3d 110

Mike LETTUNICH, in his capacity as general partner and limited partner of Lettunich & Sons Limited Partnership, Plaintiff–Respondent,

v.

Edward LETTUNICH, in his capacity as general partner and limited partner of Lettunich & Sons Limited Partnership, Defendant–Appellant,

and

Lettunich & Sons Limited Partnership, an Idaho limited liability partnership, pursuant to Idaho Code § 53–300 et seq.; and Ann Lettunich, in her capacity as limited partner in Lettunich & Sons Limited Partnership, Defendants.

No. 28619.

Supreme Court of Idaho, Boise, February 2005 Term.

March 29, 2005.

Rehearing Denied May 4, 2005.

White Peterson P.A., Nampa, for appellant. William A. Morrow argued.

Hawley Troxell Ennis & Hawley, LLP, Boise, for respondent. Merlyn W. Clark argued.

JONES, Justice.

This appeal challenges several orders and the final judgment entered by the district court in an action to dissolve a partnership and to enforce a settlement agreement made by the parties during the course of the action. We affirm the district court, except for two orders, one of which we reverse; the other we vacate and remand for further proceedings.

## I.

## BACKGROUND

In 1969, Peter Lettunich and his family moved to Payette County, Idaho, where they established and operated a cattle ranch situated on the banks of the Payette River. The Lettunich family formed Lettunich & Sons

Partnership, a general partnership, to conduct the business. When Peter passed away, his partnership interest passed to his sons Mike and Ed, his wife Anna, and his daughter Tess Ucovich. In 1985, Tess decided to sell her interest in the partnership, so she and her brothers and their wives (who were not partners) executed an agreement for the sale of her interest in the partnership. Tess took a promissory note.

In 1991, the brothers reorganized the partnership into a limited partnership (the Partnership). Anna became a limited partner and Mike and Ed each became both general and limited partners. The brothers ran the business with little formality: they never conducted formal meetings, they used Partnership funds for non-Partnership purposes, and they lived on Partnership property. Neither brother objected to such informalities.

In 1997 the Payette River flooded, forcing the brothers to move their cattle to higher ground. Unfortunately, the cattle escaped the flood only to eat toxic onions, causing the death of some 250 head. The ranch was uninsured so the Partnership had to absorb the financial loss. To keep the business afloat, the Partnership took out several loans. Its financial condition, however, did not improve. The Partnership's bank ceased lending, so in 1998 the brothers each committed some of their own funds to the Partnership. Despite these efforts, the Partnership did not regain financial stability. As the Partnership's financial condition soured, so too did relations between the brothers. Eventually, all communication between them ceased, save for the occasional note or fax transmission.

Things got no better—financially or between the brothers—and Mike considered selling his interest in the Partnership. A sale never materialized. In March 1999, Mike filed an application in the district court for Payette County to dissolve the Partnership. That October, the parties mediated the matter and entered into a "Stipulation of Compromise and Settlement Agreement" (the Compromise), which provided for winding up and terminating the Partnership and authorized a dispersing agent to carry out such provisions. The Partnership hired the dispersing agent shortly thereafter. The court approved the Compromise and retained jurisdiction over the matter to oversee its performance.

Ed wanted Mike's interest in the Partnership so the Compromise included an option for Ed to buy Mike's interest. According to the Compromise, if Ed did not exercise his option, the dispersing agent would liquidate the Partnership's assets. Ed did not exercise his option, so after the option period expired the dispersing agent sold the Partnership's personal property. The dispersing agent also located a willing buyer, Fallon Enterprises, Inc. (Fallon), for the real estate and moved the court for an order authorizing him to sell the property. Ed promptly filed a motion to reject the dispersing agent's motion and moved to authorize sale of the property to him. Mike filed a motion to reject Ed's motion and joined the dispersing agent's motion. After conducting a hearing on the motions, the court concluded the Fallon offer was the better one for the Partnership. It issued an order authorizing the sale of the property to Fallon and set May 1, 2001 as the closing date. The property consisted of eight legally separate parcels. Ed filed a motion to exclude one of them, known as "Parcel H," contending it was not Partnership property. The court found otherwise and denied his motion.

With the sale of the property approaching, Ed filed a bankruptcy petition on behalf of the Partnership on April 18, 2001. He quickly dismissed it, but within days filed a second bankruptcy petition. Upon Mike's motion to dismiss, the bankruptcy court dismissed this petition on May 1, 2001. Meanwhile, the Partnership owed one of its creditors, Met-Life, nearly $400,000 and was planning to pay it off with proceeds from the sale of the property. The dispersing agent later testified that MetLife had been willing to waive a prepayment penalty of around $13,000 if the sale had closed on May 1. May 1 came and went, but the sale did not close. Ed filed another motion to reconsider regarding the sale of the property and a motion to compel acceptance of a new offer of his, or an offer his daughter's company, River Cattle Company, had produced. After a hearing the court

denied both motions and reset the closing date to June 20, 2001. In the following weeks Ed filed numerous motions, with both the district court and this Court, all seeking in some form or another to halt the impending sale of the property. All were denied and the sale finally closed on September 19, 2001.

The winding-up process spawned many other issues and, over the course of seven days in November 2001, December 2001, and January 2002, the court conducted hearings on the remaining issues. In April 2002 the court issued its Findings of Facts and Conclusions of the Court (Findings and Conclusions). Therein it determined, relevant to this appeal, (1) the Compromise provided for settlement of the partnership capital accounts through October 25, 1999; (2) the Tess Ucovich promissory note was a Partnership obligation and payable immediately from Partnership assets; (3) the MetLife prepayment penalty was to be charged against Ed's capital account; (4) the personal funds committed to the Partnership by Mike and Ed in 1998 were capital contributions, not loans; and (5) the dispersing agent's attorney fees were payable from Partnership funds.

Mike filed an application seeking attorney's fees, which, after a hearing, the court granted. With the final accounting completed and all the property liquidated, the court issued a Judgment and Decree of Partnership Dissolution and Termination (Judgment) on August 2, 2002. This appeal timely followed.

## II.

## STANDARD OF REVIEW

 When we consider an appeal from a district court sitting as the fact finder, we do so through our abuse-of-discretion lense; that is, we examine whether the trial court (1) rightly perceived the issues as ones of discretion; (2) acted within the outer boundaries of that discretion and appropriately applied the legal principles to the facts found; and (3) reached its decision through an exercise of reason. *Sun Valley Shopping Ctr. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991). In conducting our review, we liberally construe the district court's findings in favor of the judgment. *Ervin Constr. Co. v. Van Orden*, 125 Idaho 695, 699, 874 P.2d 506, 510 (1993). We will not disturb a district court's findings of fact unless they are clearly erroneous. A court's findings of fact are not clearly erroneous if they are supported by substantial and competent, though conflicting, evidence. *Sun Valley Shamrock Resources, Inc. v. Travelers Leasing Corp.*, 118 Idaho 116, 794 P.2d 1389 (1990); *Murgoitio v. Murgoitio*, 111 Idaho 573, 576, 726 P.2d 685, 688 (1986); I.R.C.P. 52(a).

## III.

## DISCUSSION

In the ensuing paragraphs, we consider the district court's finding that Parcel H was Partnership property, its order authorizing the sale of the property, its finding on the accounting called for in the Compromise, its order on the Ucovich promissory note, its finding on the funds committed by the brothers to the Partnership in 1998, its order charging Ed with the MetLife prepayment penalty, and its order on attorney fees. We also consider whether to award attorney fees on appeal.

### A.

### Parcel H

Ed contends that Parcel H, which was apparently titled in the names of Anna Lettunich as widow, Ed and Sandra as husband and wife, and Mike and Renee as husband and wife, was not Partnership property.[1] Since Idaho is a community property state, he argues Sandra and Renee held community property interests in the parcel, there was no evidence of transmutation, and thus the dis-

---

1. The only documentary evidence in the record as to the status of the title is a title company report. Parcel H was not listed among the original general partnership's assets, but it was listed as an asset in the limited partnership agreement. No deed or agreement for the acquisition of the parcel is in the record, however, so precisely how and when Parcel H became Partnership property is unknown.

trict court erred in divesting the wives of their interest without their participation in the case. Under Idaho Code section 53–308, property acquired with partnership funds is partnership property unless a contrary intent is shown. I.C. § 53–308(2) (repealed 2001).[2] Typically, this is so even if the property is taken in the name of someone not associated with the partnership. *Bussell v. Barry*, 61 Idaho 350, 102 P.2d 280 (1940); *see also Murgoitio*, 111 Idaho at 576–577, 726 P.2d at 688–689; 59A Am.Jur.2d *Partnership* § 258 (2003), citing *Korziuk v. Korziuk*, 13 Ill.2d 238, 148 N.E.2d 727 (1958); *Rizzo v. Rizzo*, 3 Ill.2d 291, 120 N.E.2d 546, 552 (1954); *Einsweiler v. Einsweiler*, 390 Ill. 286, 61 N.E.2d 377 (1945). Intent is a question of fact. *Murgoitio*, 111 Idaho at 576, 726 P.2d at 688.

■ Ed points us to Justice Bistline's concurrence in *Murgoitio* to support the proposition that Sandra and Renee held community property interests in Parcel H. In *Murgoitio*, we affirmed the district court's finding that the real property at issue, titled in the names of the individual partners and their non-partner wives, was partnership property. We noted that the property was purchased, improved, maintained, and insured with partnership funds and used for the partnership business. The property taxes were paid with partnership funds. Nevertheless, Justice Bistline experienced "[m]uch difficulty" understanding how the district court could divest a married woman of property titled in her name without joining her as a party. 111 Idaho at 580, 726 P.2d at 692 (Bistline, J., specially concurring).

What was overlooked in that concurrence and what Ed overlooks in this case, however, is that no community interest exists unless and until the spouse actually *acquires* the property during marriage by means other than gift, bequest, devise, or descent. I.C. §§ 32–906, 32–903. Mike submitted an affidavit in which he indicated that the parcel

was acquired with Partnership funds, treated as Partnership property, and used for the Partnership's benefit. Property taxes on the parcel were paid from Partnership funds. Ed presented no evidence or testimony on the issue. The district court ruled that Parcel H was "acquired partnership property." Since the court found the Partnership, not the individuals, acquired this parcel, it follows that no community interest ever existed in it. The evidence underlying the district court's findings is substantial and competent and we therefore uphold its ruling.

### B.

### The Order Authorizing the Sale of the Property

■ Ed next contends the court erred in authorizing the dispersing agent to sell the property to Fallon because he, as a partner and family member, was the more logical buyer. He asserts that the offers he and his daughter's company produced were for more money and on terms more favorable to the Partnership. In the abstract, fairness may dictate that the property be sold to the remaining partners, particularly when the property is part of the family business and family members reside on the property. *See, e.g., Maras v. Stilinovich*, 268 N.W.2d 541, 544 (Minn.1978); 59A Am.Jur.2d *Partnership* § 720 (2003). There is, however, no general rule directing to whom partnership assets must or should be sold during the winding-up process. Nor does the limited partnership agreement create such a right in any of the partners. The Compromise specifically provided that Ed would have an option to buy Mike's interest in the partnership, but he failed to exercise the option. Once Ed's option expired, he was an ordinary offeror for the real property.

■ Next, we turn to Ed's contention that his and his daughter's company's offers were better deals for the Partnership. Ed made

---

2. A note on the applicable law: Idaho Code section 53–266 provides that rules not provided for in the Limited Partnership Act shall be governed by the Uniform Partnership Act (UPA). There is no rule in the Limited Partnership Act governing acquisition of property. Hence, the UPA's rule regarding partnership property ap-

plies. The Idaho legislature repealed the UPA in 2001 and adopted a new version, but as Ed points out, the events leading up to this case took place before the old UPA's demise and so to the extent the Limited Partnership Act makes no provision on a matter, the pre–2001 version of the UPA applies.

two offers. The first was for $2.6 million—$80,000 more than Fallon's offer. At a hearing on the offer, though, an accountant testified that Ed's offer included credits of his and his mother's partnership interests, so it amounted to an offer to purchase the partnership interests. The accountant indicated this would have adverse tax consequences for the Partnership. Taking this testimony into account, the court ruled the Fallon offer was in the Partnership's best interests. In its order authorizing sale the court noted the "pernicious" tax consequences of Ed's offer and, in addition, that the precise value of the partners' respective interests had not yet been calculated and thus was not and could not then be known.

Ed's second offer, the same in many respects but revised to eliminate the partnership credits, came well after the court authorized the sale to Fallon. The River Cattle Company offer—$3.5 million—also came well after the court's initial order. Nevertheless, Ed argued that since Fallon had not closed on the closing date, it should forfeit its earnest money and the court should accept one of the new offers. The testimony is in conflict as to whether Fallon then had the financing necessary to close. Other testimony reveals that Fallon would not close so long as Ed's cattle remained on the property. There was also the matter of the disruption caused by Ed's bankruptcy petitions. Again, our focus in reviewing the district court's order is not on whether we would have made the same decision, but rather on whether the court's ruling was based on substantial and competent evidence. All told, we find nothing clearly erroneous about the order authorizing the sale or the court's decision to extend the closing date.

■ Finally, Ed contends the court erred in authorizing the dispersing agent to execute the documents necessary to close the sale. He says (1) the court had no admissible evidence before it that would justify the order and (2) the parties never envisioned granting the dispersing agent the authority to sell the property. However, the plain language of paragraph 1.7 of the Compromise provides: "All real estate shall be sold by the Dispersing Agent with a qualified real estate broker of his choosing, for not less than fair market value." The court's order approving the Compromise provided that the dispersing agent "is empowered and authorized to carry out the terms and provisions of the [Compromise] in accordance with its terms and provisions." Thus, the dispersing agent was equivalent to a receiver. *See* I.C. §§ 8-601-606. Receivers have the authority to "do such acts respecting the property as the court may authorize." I.C. § 8-605. There was no testimony or other evidence indicating the partners wished to retain the authority to execute closing documents or that paragraph 1.7 meant something other than what it so plainly states. We are thus unable to agree with Ed that the partners "never envisioned" granting the dispersing agent the authority to sell the property.

## C.

### The Accounting Called For
### In the Compromise

■ We turn next to Ed's contention that the court erred when it deemed all claims regarding the partners' accounts settled as of October 1999. Ed testified that Mike used Partnership funds for non-Partnership purposes during the pre-Compromise years. Mike acknowledged such use but pointed out that Ed had done the same. The parties disputed whether all such expenditures were to be re-examined under the Compromise. In its Findings and Conclusions the district court ruled that each brother's claims against the other's capital accounts merged into the Compromise and were thus settled. The court wrote that (1) deferring to the accountants was compatible with the partners' admitted-to use of Partnership property for non-Partnership uses and the resulting difficulty in distinguishing between Partnership and non-Partnership property; (2) by titling the Compromise a "compromise" the parties intended claims predating the Compromise to be merged therein; (3) the parties delegated to the accountants the task of resolving the claims regarding the accounts.

The Compromise recites that it was "intended to be binding and enforceable upon the terms stated herein, notwithstanding the

fact that additional documentation is required to carry out" such terms. The document goes on to provide a complete scheme for winding up the Partnership, including provisions for resolving disputes that may arise. The parties included a provision to determine their capital account balances, assigning this task to named accountants. They agreed in paragraph 1.14 of the Compromise "to have an analysis of the capital accounts from the beginning of the partnership performed by Ray Simms in conjunction with Harold Bussman [sic] and Mike Lindstrom at the cost of the Partnership, to determine the correct present capital account balances." The partners subsequently agreed to excuse Mr. Simms. The accounting was performed by Mr. Busmann, representing Ed, and Mr. Lindstrom, representing Mike. Both accountants signed off on the accounting, although Ed's counsel contended at oral argument that Mr. Busmann had no authority to do so.[3]

The Compromise states that it "is intended to memorialize the terms of a compromise and settlement agreement made by and between" the parties. As part of their settlement, the parties agreed to have their accountants determine their capital account balances. The accountants' report was based upon Partnership financial documents, it covered the Partnership's full lifespan, and it included itemized charges for personal expenditures made by the partners. During the Partnership's existence, its financial statements and tax returns were prepared for, and signed and filed by, the partners, utilizing this information. Accordingly, the "analysis" of the partners' capital accounts, as prepared by the parties' accountants and adopted by the court in the Judgment, is supported by substantial evidence and will not be disturbed on appeal.

### D.

### The Promissory Note

■ Ed next contends that the Tess Ucovich promissory note was a personal obligation, rather than one of the Partnership.

The agreement and promissory note relating to Tess's sale of her interest in the Partnership identify the "Buyers" as Ed, Sandra, Mike, and Renee. Neither refers at all to the Partnership. Anna's signature appears on neither document. Ed's accountant, however, testified the note was treated as a Partnership obligation. The district court found that, since the note was treated as a Partnership obligation on state and federal tax returns and since the annual installments were paid from Partnership funds without charging the partners' capital accounts, it was a Partnership obligation. Ed theorized that the promissory note must have been a personal obligation because a partnership cannot own an interest in itself. He provided no authority for this theory, and there is indeed no rule requiring the individual partners to buy out an outgoing partner. In fact, it is entirely possible that a partnership can buy out a partner, who then becomes an ordinary creditor of the partnership.

Ed also argues that if the note was a Partnership obligation, the court erred in ordering it payable immediately. Paragraph 1.7 of the Compromise provides, "Proceeds from the sale of real estate, after deducting costs of sale, are to be applied to retire and satisfy all debts of the partnership. . . ." Thus the district court's order was entirely consistent with the terms of the Compromise. Moreover, paying off debts is necessarily included within the meaning of "winding up", and creditors other than partners get first priority. I.C. § 53–247.

### E.

### The Personal Funds Committed by the Brothers

■ Ed contends that it was in fact Sandra, not he, who contributed $85,233.42 to the Partnership in 1998, and that neither of them ever intended that money to be a capital contribution. In his brief, Ed cited a trial exhibit for his contention that it was his wife

---

**3.** Any dispute between Edward Lettunich and his accountant is beyond the scope of this appeal and will not be addressed here.

who contributed the money. But that exhibit does not mention either loans or any sort of financial contribution from Sandra.[4] Ed testified that the contribution came from Sandra's inheritance. Sandra, however, never testified, and the record contains no loan agreement, check, or other documentation to shed any definitive light on just who contributed the $85,233.42. Mike, on the other hand, testified that he did not intend the funds to be loans and that interest was never discussed. Accountant Lindstrom testified that in examining the Partnership books he found no evidence the funds were to be treated as loans. The Partnership's financial statements and state and federal tax returns indicate the funds were, in fact, capital contributions. Though the evidence may be conflicting, we find that it is substantial enough to sustain the court's ruling.

### F.

#### The District Court's Order Charging Ed's Capital Account with the Prepayment Penalty

█ Ed next argues that the court erred in charging his capital account with the Met-Life prepayment penalty. During one of the final hearings, the dispersing agent testified that a MetLife representative implied the prepayment penalty of $12,867.19 would be waived if the mortgage was paid off early. There was no written evidence of this waiver and the MetLife representative who allegedly agreed to this waiver never testified. There is no indication of consideration having been provided for a waiver or that the "waiver" was anything more than a gratuitous promise, if that. Moreover, none of the conflicting testimony pinpointed just why the penalty waiver was withdrawn. The decision to charge Ed's capital account was not based on substantial evidence. It, therefore, must be reversed.

### G.

#### The Orders Denying Ed's Motions to Disqualify the Dispersing Agent's Attorney and to Remove the Dispersing Agent

Ed argues that the district court erred when it refused to disqualify the dispersing agent's attorney and when it approved payment of the dispersing agent's attorney fees. The parties authorized the dispersing agent to hire counsel and committed the Partnership to pay the dispersing agent's attorney fees. The district court appropriately exercised its discretion in denying the motion to disqualify and in approving payment of the attorney fees incurred by the dispersing agent.

We find no fault with the district court's handling of Ed's motion to remove the dispersing agent. Ed argued that the dispersing agent had allied with Mike against him and thus was not acting in the Partnership's best interests. The district court noted that, despite Ed's contentions, the dispersing agent filed monthly accountings and there was no evidence money had been misappropriated or unaccounted. On appeal, Ed argues the court erred in not removing the dispersing agent for the same reasons he argued the Judgment itself was reversibly defective: the dispersing agent failed to adequately consider Ed's offers to purchase the property; he accepted Mike's refusal of those offers as conclusive; he failed to present any of Ed's offers to the court; he redrafted and accepted Fallon's offer instead of rejecting it; and he failed to determine whether Fallon was financially able to buy the property. The court considered those issues and disagreed. Ed asserts the dispersing agent was a fiduciary. Even if we accept this assertion, Ed failed to demonstrate how the dispersing agent breached his duty or to provide any other factual or legal basis which would justify reversal on this issue.

---

4. The exhibit, Exhibit 509, is a handwritten list of various sums paid by Mike and Ed for what appear to be various Partnership bills. It was prepared by accountant Busmann in preparing the Partnership's 1998 tax returns. It contains no check numbers and no notes, and it does not cite to any other exhibit or document that might indicate whether the funds were Ed's or Sandra's or whether they were capital contributions or loans. Mr. Busmann did not testify as to whether Sandra advanced the funds in the "Ed" column.

## H.

### The District Court's Award of Mike's Attorney's Fees

■ The Compromise contained two provisions concerning attorney's fees. Paragraph 1.20, under the heading "Terms of Sale, Winding Up and Termination of the Partnership," provides, "[e]ach party to pay their own attorney fees and accounting fees." The court awarded Mike $175,854 in attorney fees based on paragraph 5 of the Compromise. That paragraph reads: "In the event of any legal action to enforce the terms of this settlement agreement, the prevailing party shall be entitled to an award of costs, including attorney fees." Attorney fees are allowable if provided for in a contract. Such provisions "represent an election by the parties to place the risk of litigation costs on the one who is ultimately unsuccessful." *Holmes v. Holmes,* 125 Idaho 784, 787, 874 P.2d 595, 598 (Ct.App.1994).

### 1.

### The "trial" was a "legal action to enforce the terms" of the Compromise

■ Ed argues the "trial" was not a "legal action to enforce the terms" of the Compromise. The "trial" was essentially a series of evidentiary hearings on the remaining contested motions, namely, the dispersing agent's motion to pay off the Tess Ucovich note and other expenses and fees; Mike's motion to approve the capital accounts through November 2001 and to charge Ed's account with certain expenses and fees; and Ed's motions regarding Parcel H, the accounting, and various fees and expenses. In its Findings and Conclusions the court concluded that the "overriding issues" in the case involved enforcing the Compromise, enforcing the court's orders, and approval of the dispersing agent's actions. Ed contends these issues were necessary components of

the winding-up process, not aspects of an "action to enforce." He offers the definition of "enforce," which he says means "to compel obedience to." It also means "to give force or effect to." BLACK'S LAW DICTIONARY 569 (8th ed.2004). Since the "trial" concerned the dispersing agent's efforts to carry out his court-ordered duties, Mike's efforts to assist the dispersing agent, and Ed's objection to those efforts, it seems the "trial" could be fairly characterized as a "legal action to enforce the terms" of the Compromise within the ordinary meaning of those terms.

### 2.

### The fees were incurred in an "action" and Mike was the prevailing party.

■ Ed also contends that certain fees either were not incurred in an "action" or were for motions on which Mike was not the prevailing party.[5] First, Mike's fees for the dispersal sale, the negotiations for the sale of the property, and for the sale itself, related to issues tried at some point or another to the district court. Hence, they related to the "action." Second, in deciding whether a party was the prevailing one the inquiry is not conducted motion-by-motion or argument-by-argument. *See Holmes v. Holmes,* 125 Idaho at 787, 874 P.2d at 598. Instead, the focus is properly directed at the criteria enumerated in I.R.C.P. 54(d)(1)(B). That is, the court

> shall in its sound discretion consider the final judgment or result of the action in relation to the relief sought by the respective parties, whether there were multiple claims, multiple issues, counterclaims, third party claims, cross-claims, or other multiple or cross issues between the parties, and the extent to which each party prevailed upon each of such issue or claims.

I.R.C.P. 54(d)(1)(B). A trial court's determination on whether a party prevailed is a

---

**5.** Those items he contends did not relate to an "action" were the dispersal sale, negotiations between Ed and Mike for the sale of the real property, and the sale of the property. The motions on which Ed says Mike was not the prevailing party were Mike's motion to compel Ed's payment for cattle he purchased at the dispersal sale (the court granted Ed an extra week) and Mike's motion seeking a temporary restraining order requiring Ed to remove his cattle from the property (it was withdrawn after the parties agreed that Ed could keep his cattle on the property if he paid rent).

matter of discretion. *Holmes,* 125 Idaho at 787, 874 P.2d at 598. After entertaining Ed's objections to Mike's request for attorney's fees, the district court disallowed fees on one item and characterized the other objected-to items as necessary for Mike to assist the dispersing agent in carrying out his duties. Ed has not persuaded us otherwise. Thus, we conclude the district court acted within the bounds of its discretion in determining the items for which fees were awardable and in making the fee award.

### 3.

### The ruling on the amount of fees is vacated and remanded.

Ed also takes issue with the amount of fees awarded, contending they are excessive and unreasonable. We agree—to an extent.

█ Rule 54 provides the criteria courts must consider in awarding attorney's fees. In its order on fees the district court noted the long lifespan and difficult, undesirable nature of the case, the experience of Mike's counsel, and the fact that Mike obtained a favorable result. The court noted that the hourly rates of Mike's lawyers were "consistent with attorneys similarly situated in the largest of Idaho firms." The court stated "the balance of the 54(e)(3) criteria, are unknown to the court."

█ We acknowledge that calculation of the amount of attorney fees is committed to the sound discretion of the trial court. *Eastern Idaho Agricultural Credit Ass'n v. Neibaur,* 133 Idaho 402, 987 P.2d 314 (1999). And we do not disagree with the findings the court made. However, we believe the court can improve on its examination of the Rule 54(e)(3) criteria. The rule, employing the term "shall," is mandatory—it requires the court to consider all eleven factors plus any other factor the court deems appropriate. To examine some factors, simply declare the rest unknown, and yet award the full amount of fees requested, we believe, in this case, is not sufficiently thorough to withstand appeal. For one thing, the affidavit Mike's counsel submitted essentially addresses only criterion (D) (prevailing charges for like work) and asserted that the fees were "reasonably and

necessarily incurred." These statements, plus the billing sheets showing how much was billed, do not equip the court with enough information to arrive at a reasonable award.

Criterion (D) requires the court to consider "the prevailing charges for like work." Here, the district court found, instead, that the hourly fees of Mike's lawyers were consistent with those charged by the "largest of Idaho firms". In determining the reasonableness of an hourly rate, the court should consider "prevailing charges" in a geographic context, rather than in a strata context. That is, the court should consider the fee rates generally prevailing in the pertinent geographic area, rather than what any particular segment of the legal community may be charging.

Additionally, we believe, having examined the record before us, that the amount awarded exceeds that ever-elusive definition of reasonableness. For example, Mike's three attorneys billed about 379 hours, or around $70,000, for the final hearings and preparation therefor. Assuming a 10–hour day, that amounts to roughly 44 hours spent outside of court for every 10 in court. Under the "time and labor required" criterion, that seems somewhat excessive. So, too, does the $54,000 spent on post-trial briefing. Over the span of one and a half months, Mike's attorneys spent 267 hours drafting or discussing briefs. Much of this time involved two attorneys working on the same project, according to the billing statements. Further, two of Mike's three attorneys were partners in their firm and well seasoned litigators. Some consideration should have given as to the necessity of this legal firepower. While the time and labor expended is certainly a factor to consider, it is to be considered under a standard of reasonableness. *Daisy Mfg. Co. v. Paintball Sports,* 134 Idaho 259, 999 P.2d 914 (Ct.App.2000).

For these reasons, we vacate the award of attorney's fees and remand to the district court for another look at the appropriate amount of the award.

## I.

### Attorney's Fees on Appeal

██ Both Mike and Ed seek attorney's fees on appeal pursuant to I.C. § 12–121. Ed has not prevailed and is not entitled to attorney fees on appeal. We decline, also, to award fees to Mike.

██ Under I.C. § 12–121, we may award attorney fees to the prevailing party only if we are left with the abiding belief that the appeal was brought or pursued frivolously, unreasonably, or without foundation. *Durrant v. Christensen*, 117 Idaho 70, 74, 785 P.2d 634, 638 (1990). When an appeal presents no meaningful question of law, but simply invites us to second-guess the trial court's rulings on conflicting evidence, an award of attorney fees is appropriate. *Pass v. Kenny*, 118 Idaho 445, 797 P.2d 153 (Ct.App.1990). Although we have affirmed all but two of the district court's rulings in this case, and though the rulings we have affirmed reflected the proper application of the law to facts based on substantial evidence, we do not believe that this appeal was pursued frivolously, unreasonably, or without foundation. We therefore decline to award attorney fees on appeal.

## IV.

### CONCLUSION

We reverse the order charging Ed's capital account for the MetLife prepayment penalty. We vacate the district court's order on the amount of attorney fees and remand so that the court can give further consideration to the reasonableness of the attorney fees sought by Mike. The remaining contested orders in this "unfortunate and tortured case," as the district court put it, are affirmed. Costs to Mike, but no fees on appeal.

Chief Justice SCHROEDER, and Justices TROUT, EISMANN and BURDICK concur.

